**STANLEY CO. OF AMERICA, Inc., v. AMERICAN TELEPHONE & TELEGRAPH CO. et al.**

**GENERAL TALKING PICTURES CORPORATION v. SAME.**

**DUOVAC RADIO CORPORATION v. SAME.**

Nos. 985, 996, 997.

District Court, D. Delaware.

June 28, 1933.

Hugh M. Morris, of Wilmington, Del., and Samuel E. Darby, Jr., and George E. Quigley, both of New York City, for plaintiff Stanley Co. of America. Hugh M. Morris, of Wilmington, Del., and Samuel E. Darby, Jr., and Ephraim Berliner, both of New York City, for plaintiff General Talking Pictures Corporation.

Hugh M. Morris, of Wilmington, Del., and Samuel E. Darby, Jr., of New York City, for plaintiff Duovac Radio Corporation.

George F. Hurd (of Greene & Hurd), of New York City, and C. M. Bracelen and John H. Ray, both of New York City, and Marvel, Morford, Ward & Logan, of Wilmington, Del., for defendants.

NIELDS, District Judge.

Motions for preliminary injunctions are made on behalf of plaintiffs in three equity suits brought under section 16 of the Clayton Act (15 USCA § 26) to restrain defendants from alleged violations of section 3 of that act (15 USCA § 14) and of sections 1 and 2 of the Sherman Anti-Trust Act (15 USCA §§ 1, 2).

In their main brief plaintiffs state the measure of relief sought by these motions for preliminary injunctions. "It is therefore submitted that an injunction pendente lite should issue herein in all three cases enjoining and restraining the defendants from enforcing directly or indirectly the restrictive clauses of the so-called leases of reproducing equipments, whereby the exhibitors are required to obtain exclusively from Products [Electrical Research Products, Inc.] all repair and replacement parts for said equipments and to permit Products to inspect the same, and charge the Exhibitor therefor, under the guise of rendering service thereto. In addition, in the suit of the Duovac Company, an injunction should issue pendente lite enjoining and restraining the defendants from directly or indirectly enforcing any of the provisions of the producing license agreements whereby the producing licensees of Products are required to obtain exclusively from Products repair and replacement parts for producing apparatus."

The motions deal with covenants in agreements the effect of which may be to substantially lessen competition in interstate commerce in the talking motion picture business. Roughly, that business is handled by the manufacturers, the producers, and the exhibitors. The manufacturers make the recording equipment for the producers of films. This equipment records sound and photographs action in timed relation on the films. The manufacturers also make reproducing equipment for the exhibitors. This equipment synchronously reproduces the sound and projects the action on the theater screens. The producers use the recording equipment in producing the films. The exhibitors use the reproducing equipment in the theaters.

The plaintiff Stanley Company of America, Inc. (Delaware) is a subsidiary of Warner Bros. It is an exhibitor, owning a chain of about one hundred fifty theaters. The plaintiff Duovac Radio Corporation (Delaware) is engaged in the manufacture of electrical devices, including vacuum tube amplifiers and photo electric cells. The plaintiff General Talking Pictures Corporation (Delaware) is a manufacturer of talking motion picture equipment.

In each case the defendants are the same. Western Electric Company, Inc., is a manufacturer as above defined. American Telephone & Telegraph Company is a defendant holding 95 per cent. of the capital stock of Western. Electrical Research Products, Inc., herein called "Products" supplements the business of Western by licensing under patents and leasing producing and reproducing equipment and also furnishing services relating to the upkeep of the equipment.

Section 3 of the Clayton Act (15 USCA § 14) provides: "It shall be unlawful for any person engaged in commerce, in the course of such commerce, to lease or make a sale or contract for sale of goods, wares, merchandise, machinery, supplies or other commodities, whether patented or unpatented, for use, consumption or resale within the United States or any Territory thereof or the District of Columbia or any insular possession or other place under the jurisdiction of the United States, or fix a price charged there-

for, or discount from, or rebate upon, such price, on the condition, agreement or understanding that the lessee or purchaser thereof shall not use or deal in the goods, wares, merchandise, machinery, supplies or other commodities of a competitor or competitors of the lessor or seller, where the effect of such lease, sale, or contract for sale or such condition, agreement or understanding may be to substantially lessen competition or tend to create a monopoly in any line of commerce."

An examination of the numerous affidavits and voluminous exhibits filed on this motion shows that certain restrictive agreements contained in the licenses or leases made by Products are inherently illegal—the import of which could not be changed by testimony. These restrictive agreements are: (1) The tying agreements in the licenses or leases of Products to exhibitors, whereby exhibitors agree to purchase from Products all repair and replacement parts for the reproducing apparatus and equipment leased by Products. (2) The exclusive agreements in the contractual letters accompanying the leases of Products to producers whereby producers agree to distribute films produced on the producing apparatus only to exhibitors supplied with Products' reproducing apparatus and equipment.

The tying agreements on the part of exhibitors to purchase repair and replacement parts from Products are found in all the licenses or leases made by Products of reproducing apparatus or equipment to exhibitors. For example, in the license or lease dated July 29, 1931, from Products to Stanley Company of America (Plaintiffs' Exhibits Vol. III, Exhibit J), we find the following agreements. Section 2 (b): " * * * It is agreed that all additional and renewal parts and assembled parts for the Equipment shall be obtained from Products and that all repairs to the Equipment shall be made as specified by Products. Products may from time to time at the expense of the Exhibitor, supply and install such spare and renewal parts as may, in its opinion, be necessary to the satisfactory operation and maintenance of the Equipment."

These tying agreements found in the licenses or leases of reproducing apparatus and equipment made by Products to exhibitors are rendered more effective and burdensome by additional sections of the licenses:

Section 7—"The Exhibitor agrees to pay to Products upon rendition of invoices therefor its standard charges as from time to time established for any repairs to the equipment and for any additional equipment or spare or renewal parts, furnished or supplied by Products and to pay the transportation charges thereon. * * * "

Section 11—"The Exhibitor shall provide access for Products' representatives, engineers and mechanics to the Theatre and to all parts thereof where any of the Equipment may be, at all reasonable hours, for the purpose of supervising the installation and from time to time for the purpose of examining and inspecting the Equipment, and shall grant to Products full opportunity to make such adjustments therein and repairs thereto as, in the opinion of Products, are necessary or desirable."

Section 13—"This agreement and/or the rights of the Exhibitor hereunder and/or the license hereby granted shall, at the option of Products, terminate and come to an end in the event of any breach or default on the part of the Exhibitor with respect to any of the covenants and conditions herein contained on its part to be performed. * * * "

Section 14—"Upon termination or expiration of this license by lapse of time or otherwise, the Exhibitor shall surrender the Equipment to Products in good order and condition. * * * "

Section 18—"This license shall be for a term of ten (10) years from September 22, 1928."

Section 22—" * * * Exhibitor agrees to pay to Products the charges provided for in the payment plan hereinafter set forth; said payments to be made at the time and in the manner provided herein, which time and manner shall be of the essence of this agreement."

(1) $17,192.43. (2) A "weekly rental charge" of $40 per week.

The exclusive agreements in the contractual letters accompanying licenses from Products to producers is illustrated in the contractual letter of Products to Paramount Famous Laskey Corporation dated May 11, 1928 (Plaintiffs' Exhibit 18). Paragraph 5 of this contractual letter provides as follows: "5. In order to promote the use of sound records in connection with motion pictures, and to make an adequate market for your productions and for our [Products'] reproducing equipments, you agree that all theatres operated by you or by your associated companies shall install our reproducing equipments (which you agree are hereby adopted as the standard equipment for such purposes), wherever and as rapidly as in your judgment conditions per-

mit, and we will supply such equipments as rapidly as we are able to after receipt of orders therefor. * * *"

Similar exclusive agreements are in the contractual letters of Products to other producers and are indorsed "Accepted" by the producers. These letters accompany the licenses (recording license agreements) of producing apparatus and equipment of Products to the producers. The licenses are for sixteen years.

The exclusive agreements in the contractual letters require producers to refrain from distributing the talking motion pictures to theaters and exhibitors who have not acquired reproducing equipment from Products. As the result of these exclusive agreements, the supply of talking motion pictures would be substantially closed to exhibitors who did not install reproducing apparatus and equipment purchased from Products. These exclusive agreements are bound to restrain exhibitors from using or dealing in goods, wares, merchandise, machinery, supplies, or other commodities of a competitor or competitors of Products.

I find from the proof submitted in support of the motions for preliminary injunctions that the tying agreements contained in the licenses of reproducing equipments by Products to exhibitors and the exclusive agreements in the contractual letters of Products to producers, in fact, have substantially lessened competition in interstate commerce and will so continue unless defendants are restrained.

"Today," says Dean Pound, "we seek once more, by limiting freedom of contract, to protect those who are subjected to economic pressure against unfair advantage on the part of those who have greater economic freedom." The Clayton Act expresses this modern trend in legislation. Section 3 of the act prohibits tying agreements and exclusive agreements whose effect may be to substantially lessen competition. Such agreements are contained in the licenses of reproducing equipments by Products to exhibitors and in the contractual letters of Products to producers. I hold those agreements illegal and void. United Shoe Mach. Corporation v. United States, 258 U. S. 451, 42 S. Ct. 363, 66 L. Ed. 708; Lord v. Radio Corporation of America (D. C.) 24 F.(2d) 565, affirmed 28 F.(2d) 257 (C. C. A. 3). I have not listed the particular licenses and contractual letters of Products containing the illegal agreements dealt with in this opinion because they are numerous and substantially alike. The decrees for preliminary injunctions may be so drawn as to cover them.