GENERAL TALKING PICTURES CORPO-
RATION v. AMERICAN TELEPHONE
& TELEGRAPH CO. et al.

DUOVAC RADIO CORPORATION v.
SAME.

Nos. 997, 996.

District Court, D. Delaware.

Jan. 16, 1937.

See, also (D.C.) 4 F.Supp. 80; (D.C.) 5 F.Supp. 380.

Samuel E. Darby, Jr. (of Darby & Darby), and Ephraim Berliner (of Zeiger & Berliner), both of New York City, and Hugh M. Morris, of Wilmington, Del., for plaintiffs.

George F. Hurd (of Greene & Hurd), Charles M. Bracelen, and John H. Ray, all of New York City, and Arthur G. Logan (of Marvel, Morford, Ward & Logan), of Wilmington, Del.; for defendants.

NIELDS, District Judge.

Final hearing in two equity suits brought under section 16 of the Clayton Act (15 U.S.C.A. § 26) to restrain defendants from alleged violations of section 3 of that act (15 U.S.C.A. § 14) and of sections 1 and 2 of the Sherman Anti-Trust Act (15 U.S.C.A. §§ 1, 2). Sections 3 and 16 of the Clayton Act provide:

"Sec. 3. It shall be unlawful for any person engaged in commerce, in the course of such commerce, to lease or make a sale or contract for sale of goods, wares, merchandise, machinery, supplies or other commodities, whether patented or unpatented, for use, consumption or resale within the United States or any Territory thereof or the District of Columbia or any insular possession or other place under the jurisdiction of the United States, or fix a price charge therefor, or discount from, or rebate upon, such price, on the condition, agreement or understanding that the lessee or purchaser thereof shall not use or deal in the goods, wares, merchandise, machinery, supplies or other commodities of a competitor or competitors of the lessor or seller; where the effect of such lease, sale, or contract for sale or such condition, agreement or understanding may be to substantially lessen competition or tend to create a monopoly in any line of commerce."

"Sec. 16. Any person, firm, corporation, or association shall be entitled to sue for and have injunctive relief, in any court of the United States having jurisdiction over the parties, against threatened loss

or damage by a violation of the antitrust laws, including sections two, three, seven and eight of this act [sections 13, 14, 18, and 19 of this chapter], when and under the same conditions and principles as injunctive relief against threatened conduct that will cause loss or damage is granted by courts of equity, under the rules governing such proceedings."

## Parties and Pleadings.

Plaintiff General Talking Pictures Corporation in 1928 succeeded DeForest Phonofilm Corporation in the ownership of a studio for recording sound pictures. Plaintiff also received from the DeForest Company three units of sound recording apparatus. The one studio unit and the two portable units were the entire recording equipment of plaintiff. It also furnished reproducing apparatus largely by the assembly of parts purchased from others.

Plaintiff Duovac Radio Corporation was engaged in the manufacture and sale of vacuum tubes and photoelectric cells from the early part of 1929 until the spring of 1933. Since the fall of 1933 it has carried on no business.

Defendant American Telephone & Telegraph Company (hereinafter referred to as "Telephone") is engaged in the long distance telephone business and is the owner of a majority interest in the voting stock of various telephone operating corporations known as the "Bell Telephone System."

Defendant Western Electric Company, Inc. (hereinafter referred to as "Western"), is engaged in the manufacture and sale of telephone apparatus. Also it manufactures and sells to Electrical Research Products, Inc., motion picture sound recording and reproducing equipment and parts therefor. Ninety-eight per cent. of the stock of Western is owned by Telephone.

Defendant Electrical Research Products, Inc. (hereinafter referred to as "Products" or "ERPI"), was incorporated December 31, 1926. It is engaged in the business of (1) granting licenses to use patented apparatus for the electrical recording and reproduction of sound in the taking and projection of motion pictures; (2) leasing equipment for such purposes; (3) leasing and furnishing repair and replacement parts for that equipment; and (4) servicing the equipment. Products is a wholly owned subsidiary of Western.

In their bills of complaint plaintiffs charge that Products entered into licenses, leases, and agreements with producers and exhibitors of talking motion pictures containing restrictive or tying provisions. As a result of these provisions, producers and exhibitors were forced to obtain and employ apparatus manufactured by Western and furnished by Products. That plaintiff General Talking Pictures Corporation "has been deprived of the market, or a substantial portion thereof, and in excess of 50% thereof, for its talking motion picture equipment * * *." Plaintiffs further charge that their business has been damaged and is subject to continuing injury. Wherefore plaintiffs are entitled to injunctive relief under section 16 of the Clayton Act (15 U.S.C.A. § 26).

The relief demanded in behalf of General Talking Pictures Corporation is:

(a) That the recording license agreements made between Products and motion picture producers termed "Producer agreements" and the leases made by Products with exhibitors termed "Reproduction agreements" be decreed by this court to be illegal and void ab initio.

(b) That defendants be enjoined from enforcing or seeking to enforce the provisions of its theatre leases in so far as they require (1) that "film and/or sound records * * * shall be acquired from the recording licensees * * * of defendants"; (2) that the license under the Mills copyrighted music license agreement "for reproduction of sound records containing copyrighted music * * * is limited to such sound records made by recording licensees * * * of defendants * * *."

(c) That defendants be permanently restrained from enforcing any provisions of license agreements with producers in so far as they restrict or limit producers in the distribution of talking motion pictures produced by them to theatres equipped with apparatus supplied by defendants; and that defendants be further restrained in so far as leases impose restrictions upon producers and distributors requiring them to discriminate in the distribution of pictures between theatres which have installed apparatus supplied by defendants

and theatres which have installed apparatus supplied by plaintiff.

Additional relief demanded on behalf of Duovac Radio Corporation is (a) that defendants be enjoined from enforcing or seeking to enforce the provisions of all theatre leases in so far as they require that all repair and replacement parts be acquired from defendants; and (b) from unjustly condemning or destroying repair and replacement parts of plaintiff.

The record covers the birth and growth of a world-wide industry. It embraces the research period, the promotional period, and the commercial period of talking motion pictures. The rapid growth of this giant enterprise from birth to maturity is one of the wonders of modern science. It involved an industrial revolution. Millions of dollars invested in studios, theatres, and actors were scrapped, and additional millions were invested in the greatest form of modern entertainment. The transition from silent motion pictures to the "talkies" involved the design and manufacture of a complicated and delicate electrical system. The transition also involved the education of thousands of engineers and technicians. The speed of transition demanded by the great producers required the imposition of this huge task upon one very large and competent industrial organization.

### Research Period.

About 1912 a small group of scientists in the engineering department of Western made fundamental studies of the characteristics of sound and of transmitting and receiving instruments. It became desirable to have records of sound and apparatus for reproducing sound superior to the phonograph. The experiments resulted in making records on wax discs and on photographic films by electrical means. The sound so recorded could be reproduced by electrical means. The group made such records on photographic film in 1916 and on wax discs in 1922.

In 1923 DeForest Phonofilm Corporation exhibited a crude talking motion picture at the Rivoli Theatre on Broadway. This company was a pioneer in the business. It operated a factory and a laboratory. It maintained a studio with three recording equipments. It had three permanent and sixty road show installations when it was acquired by General Talking Pictures Corporation in September, 1928.

In 1924 the group of Western engineers had patented devices capable of recording and reproducing sound believed by them suitable for talking motion pictures. These devices included apparatus capable of synchronizing the electrical recording of sound with the taking of pictures and the electrical reproduction of recorded sound in timed relation with the exhibition of pictures. Thereupon Western endeavored to interest the silent motion picture industry in their apparatus. The effort failed.

The business of producing silent motion pictures was large and prosperous. Producers had extensive inventories of silent pictures. Their studios were equipped only for the production of such pictures and the theatres throughout the country were built and equipped for them. Producers had huge investments and commitments in actors qualified only for making silent pictures. The change-over from silent to talking motion pictures would involve scrapping millions and the investment of corresponding amounts in sound equipment, studios, and theatres. The introduction of sound involved radical changes in every step. Other manufacturers of talking motion picture apparatus besides Western had been turned down by the producers. Repeated efforts by Gaumont, Edison, DeForest Phonofilm Corporation, Cameraphone Corporation, and others to introduce so-called talking motion pictures had failed. The industry was cynical regarding the change. With each succeeding failure of this form of entertainment the theatre patrons grew skeptical of any attempt to combine sound with motion pictures. All these factors contributed to the refusal of Western's offer.

This picture of the state of the public mind is corroborated by the testimony of the vice president and general solicitor of Warner Brothers Pictures, Inc. He testified:

"XQ194. Is it a fair statement to say that there was a considerable degree of cynicism in the industry regarding the possibility of ever introducing talking motion pictures successfully to the public? A. That is a very fair statement.

"XQ195. What, if you know, was the public feeling regarding it? A. They had

heard a great many ineffective attempts, and I think the public was very doubtful about it. * * *

"XQ198. I will limit this question to 1926–1925 and 1926? A. In 1925 and 1926, they [silent motion picture producers] had established a technique and had become rich and become powerful all on silent motion pictures.

"XQ199. And the various companies had large inventories of silent pictures, had not they? A. Large inventories of silent pictures, also a large commitment to stars who were only useful in the silent pictures, and in studios which were only useful to the production of silent pictures, and in theatres also, by the way, which were not primarily built for talking pictures.

"XQ200. Have you any idea of what the combined investment was in the silent picture inventory, say the first of 1926? A. I have not.

"XQ201. It would run into a good many millions, would it not? A. A great many."

In May, 1925, Western entered into an agreement with Walter J. Rich under which Western furnished to Rich its patented electrical sound recording and reproducing apparatus (employing the disc method) for use in an experimental production of talking motion pictures under practical studio conditions. If at the conclusion of the experiment Western's sound apparatus proved successful, Rich agreed to organize a group to finance the commercial exploitation of the apparatus and in return was to receive from Western a license. In June of that year Warner Bros. Pictures, Inc., a producer and distributor of silent motion pictures, acquired from Rich a one-half interest in his agreement with Western. In consideration thereof Warner agreed to supply the studio, photographic equipment, and necessary personnel for the experimental work. At the conclusion of the experimental period, in the spring of 1926, the parties were of the opinion that the result warranted a commercial effort. Western, Rich and Warner considered Western's apparatus the only apparatus capable of producing and reproducing talking motion pictures acceptable to the public.

Vitaphone Corporation (hereafter referred to as "Vitaphone") was organized by Rich and Warner to receive the license from Western. April 20, 1926, Western and Vitaphone entered into the so-called "Old License Agreement." The purpose of this agreement was to introduce talking motion pictures made with Western sound apparatus. This old license agreement contemplated a promotional effort to establish sound in the motion picture industry. All of the apparatus furnished by Western under the agreement employed the disc method of recording and reproducing sound. Vitaphone undertook to produce talking motion pictures with the use of Western apparatus; to persuade theatre owners to lease Western sound reproducing apparatus; to service the apparatus leased; and to solicit other producers to take recording sublicenses.

In view of the public reluctance to approve sound in the motion picture industry, it was of vital importance to offer talking motion pictures of outstanding excellence and also to protect the exhibitions against deterioration. Otherwise the promotional effort represented by the old license agreement had no chance of success. Accordingly certain leases contained a provision by which the use of sound reproducing apparatus was confined to sound pictures recorded with Western's sound recording apparatus. This provision reads: "The exhibitor agrees to use and employ the equipment only in the theatre, and when the same is used for the purpose of reproducing synchronized productions (i. e., recordings of sound in synchronism with coordinated or corelated motion pictures produced in synchronism) no recordings shall be used except those produced by licensees of the company." Western apparatus for electrically recording and reproducing sound was composed of several thousand parts designed and manufactured with precision and combined to operate in perfect co-ordination. Unless Western's sound reproducing apparatus was used to reproduce sound pictures recorded by Western's sound recording apparatus there was grave danger that the result of this effort would fail. This provision of the Old License Agreement at the time and under the conditions was reasonable. However, the provision was discarded by Products in January, 1928, more than five years before this suit was brought. No existing lease contains the provision.

During the year under the Old License Agreement, Vitaphone sublicensed only one producer, Fox-Case Corporation, on

December 31, 1926. No pictures were made by Fox-Case Corporation under this sublicense until the early autumn of 1927. August 5, 1926 a silent motion picture "Don Juan" was presented for which a musical score played by the New York Philharmonic Orchestra had been recorded. This picture aroused keen interest among producers. Similar efforts did not meet with equal response and interest declined. Vitaphone's effort to lease reproducing equipment met with little success. Out of 15,000 motion picture theatres, Vitaphone negotiated 140 leases of sound reproducing equipment.

February 17, 1927, five of the major motion picture producers—Metro-Goldwyn Pictures Corporation, Universal Pictures Corporation, First National Pictures, Inc., Producers Distributing Corporation, and Paramount—entered into a contract called the "Big Five Agreement." None of the defendants had any part in the making of this agreement. None knew of its terms until long after the agreement was made. The agreement recited that the signers were producers of silent pictures; that inventors had recently developed devices by which sound could be recorded with the taking of pictures and subsequently reproduced with the projection of the pictures; that these devices varied in nature, efficiency, and expense of installation and required different devices both in the studio for recording pictures and in the theatre for reproducing them. At the time of the agreement DeForest Phonofilm Corporation apparatus recorded and reproduced sound on photographic film. Western apparatus used the disc method. The two systems were not interchangeable and the difficulties were complicated by the various peculiar characteristics of the different sound equipments then and later available. Vocofilm Corporation used the disc method by which sound records were made at 78 r. p. m. Western's recordings by the disc were made at a speed of 33 r. p. m. R. C. A. equipment employed the film method and the sound track on its film was 100 m. in width. Western apparatus employing film used a sound track 80 m. in width. In the R. C. A. equipment the sound was picked up before the film passed through the picture projector. Western's equipment picked up the sound after the film had passed through the picture projector. DeForest film records were made at one speed; Western film records were made at another speed. These are a few of the many differences. With such a situation interchangeability was out of the question.

The Big Five Agreement recognized the complications and difficulties above recited and that noninterchangeability would prevent wide distribution of pictures. It provided for a study of various sound systems. The parties agreed not to use any recording and reproducing system unless their committee should certify that a particular system was best for the industry. Further, that they would not employ any sound system unless it should be available to all producers, distributors, and exhibitors upon reasonable terms; and that for one year none would adopt sound unless all did. The signers were to act collectively as a unit in choosing a single system and not individually.

The president of Fox Film Corporation and chairman of the Big Five Producer Committee testified as to the problems dealt with by his committee:

"Q24. Will you state, please, to the Court in your own fashion the circumstances under which that agreement was entered into and the objectives which the producers had in mind and to which this agreement was related? A. There were many problems that we felt we were facing. The Warner Company who were competitive to the rest of us had the Vitaphone contract and Mr. Fox of the Fox Company was developing his own, which he called Fox Movietone. The opinion was divided as to whether the recording reproduction was better on records or whether it was better on film, which one was the most practical.

"Then we were besieged on all sides by many different producers of equipment and all of whom claimed that they were the ones who had the basic patents and that if we dealt with anyone else we were dealing at our peril.

" * * * Then was the question of the standardization of equipment. So many claims were made for all of these various types, not only as to who had the patents, but who had the best, that everybody was confused and very much alarmed, and we had to consider this. We had no technicians trained and so we acquired the services of a great number of en-

gineers. In other words, we had to go to school and we knew nothing about it.

"We wanted primarily to deal with manufacturers that had a reputation for having maintained a lot of experimental work and who had the money to do it, and we felt the ability to turn out equipment manufacturing-wise was important, and we were interested that we could get an indemnity, and if we were in the wrong boat, and we were sued, we could get our money back.

"Q26. Do you mean 'patent-wise' when you say 'in the wrong boat'? A. Yes, patent-wise. * * *

"I think by the fall of 1927, it had pretty well boiled down to the fact that we would make one of two deals, either with the General Electric R. C. A., or with the ERPI Western Electric.

"Q35. For what reasons? What were the actuating reasons? A. The reasons were these, that we did not see anybody that we could find out that had the facilities and the reputation to stand back of the guarantees that we wanted, or the ability to indemnify us financially for the risk we had to take on the investment that we had to make in order to put this equipment in, plus the fact that we had to have hundreds of engineers to service this equipment all over the country. * * *

"It was a terrible mess. * * *

"Here was the situation: Our stock on hand of silent pictures was the only thing at that time that we had to sell, and the minute sound began to take hold and capture the public fancy, the other was a shrinking inventory, dying and discounting itself everyday. * * *

"Q40. Will you state to the Court, please, the circumstances under which that commitment from the producers was asked for and obtained, that commitment to equip their theatres? A. We were trying to pin the ERPI people down to the delivery of a given number of theatre equipments within a certain length of time, to the orders that all of us together wanted to place in our theatres, because having arrived at the point where we said we would use this type of recording equipment in our studios, we wanted to standardize that as far as our theatres were concerned, because at that time very little was known about what could be done with interchangeability between one type

of equipment in the studio and the other reproducing it in the theatre."

The record corroborates the accuracy of this testimony.

### Promotional Period.

Early in 1927 Products was organized. To it Western assigned all business relating to talking motion picture apparatus except the manufacture thereof. Western also assigned to Products its right, title, and interest in the Old License Agreement. From that time on Western was only the manufacturer of apparatus ordered from it by Products. May 18, 1927, Products and Vitaphone entered into three important contracts effective as of April 2, 1927, namely, the Termination Agreement, the New License Agreement, and the Contractual Letter. By the Termination Agreement they terminated the Old License Agreement by mutual consent. This was five years before the commencement of this suit and eight years before trial.

By the New License Agreement Products granted to Vitaphone a nonexclusive license until December 31, 1944, and thereafter until terminated by either party upon two years' written notice, (1) "to use * * * electrical sound recording equipment and synchronous recording equipment" supplied by Products "for electrically recording sound for reproduction * * * and to distribute any and all records of sound * * * to exhibitors" who should be licensed by Products to use Products' theatre sound reproducing equipment; and (2) "to examine and test" the products of the recording apparatus and "to reproduce, project or exhibit said products in its studios to prospective exhibitors thereof." By these provisions Vitaphone was restricted in the distribution of sound records to theatre licensees of Products. In October, 1928, this New License Agreement was amended to provide: "Licensee [Vitaphone] agrees * * * that it will not distribute sound records made hereunder for use with * * * any reproducing equipment, not furnished or licensed by Products, unless such other reproducing equipment operates properly, reliably and efficiently and reproduces sound from the sound records made by Licensee with adequate volume and of a quality equal to that obtained by the use of equipment supplied by Products." This is the so-called "equality

clause" objected to by plaintiff. Similar clauses were inserted in the fifteen or more producer licenses · granted during 1928 and will be dealt with more particularly hereafter.

By these three contracts, made effective April 2, 1927, Vitaphone was restricted to the production and distribution of talking motion pictures. All other activities under the old license agreement Products assumed. Products thus assumed the task of soliciting exhibitors to lease sound reproducing apparatus and of installing and servicing such apparatus. Products also assumed the task of soliciting producers of motion pictures to take recording licenses for the use of Products' sound recording apparatus. The engineers and technicians of Vitaphone were taken over by Products and formed the nucleus of its service organization.

The spring and summer of 1927 was a critical period in the effort to introduce sound into the motion picture industry. Vitaphone was the only commercial producer of talking motion pictures. The few exhibitors who had installed sound reproducing apparatus in their theatres were dissatisfied because the supply of talking motion pictures was inadequate. Other exhibitors were uncertain about sound and were unwilling to make substantial investments in sound reproducing apparatus.

In the autumn of 1927 interest in talking motion pictures was given a fresh impetus. In August, Fox-Case Corporation [Vitaphone's sublicensee] exhibited a sound newsreel of Col. Lindbergh's take-off on his flight to Paris. In October the "Jazz Singer" was presented by Vitaphone. Portions of the picture contained dialogue. The singing was synchronized with the action. Interest was increased by other successful exhibitions of talking motion pictures.

In the autumn of 1927 Products negotiated a contract with music publishers and owners of copyrighted music referred to as the "Mills Agreement." It was dated September 5, 1927, and covered a period of five years. It expired September 4, 1932, before this suit was brought. By the agreement Products for itself and future recording licensees received non-exclusive rights to record and reproduce copyrighted music. Reproduction of copyrighted music could be had only by means of reproducing apparatus furnished by Products. This restrictive provision was inserted in the agreement at the instance of Mills. In August, 1928, Mills entered into a similar agreement with a subsidiary of Radio Corporation of America. October 16, 1928, Mills waived such restriction upon reproduction of copyrighted music under both agreements. This restriction was not operative during any period when sound equipment competitive with that of Products was available to exhibitors.

The major producers who were parties to the Big Five Agreement took notice of the fresh interest and made a thorough investigation of all types of sound recording and reproducing apparatus. They considered the financial responsibility and manufacturing facilities of the manufacturers their capacity to produce in quantity as well as their research facilities for future developments. Careful consideration was given to the patent position of each manufacturer. Among others, the equipments of DeForest Phonofilm Corporation [plaintiff's predecessor], of Products, and of Radio Corporation of America were investigated. By the end of 1927 these producers definitely rejected the DeForest Phonofilm Company. They found that the only suppliers of equipment in point of financial strength, manufacturing resources, patent rights, and technical experience were the Radio Corporation of America, associated with General Electric, and Products associated with Western. It is apparent that after a year's investigation five of the largest producers selected Products as best qualified, not only to furnish studio and theatre equipment, but to teach the industry how to operate and maintain the same. This decision was reached independently and without any inducement or coercion on the part of Products. It was made by the producers solely in their interest.

### Commercial Period.

After Products had licensed a number of major producers, starting on May 11, 1928, the new industry entered its commercial period. These and similar licenses with accompanying contractual letters as well as the New License Agreement with Vitaphone and the Fox-Case Corporation license of May 10, 1928, are the principal "Producer agreements" referred to in the bill of complaint. The following is a com-

plete list of these recording licenses and contractual letters with their dates:

May 11, 1928  Paramount-Famous Lasky Corporation
    Superseded by new license, March 1, 1933.
May 11, 1928  Metro-Goldwyn Mayer Corporation
May 11, 1928  United Artists Corporation
May 18, 1928  Hal Roach Studios
June 20, 1928  Christie Film Co.
    Assigned to Metropolitan Sound Studios, Inc., Dec. 4, 1928, terminated June 30, 1931.
June 20, 1928  Christie Film Co.
May 11, 1928  Firnatone Corp.
    Superseded by license to Warner Bros. Pictures, Inc., June 1, 1934.
July 18, 1928  Universal Pictures Corporation
Sept. 25, 1928  Columbia Pictures Corporation
May 14, 1929  Sono Art Productions, Inc.
Jany. 7, 1930  Audio Cinema, Inc.
Nov. 14, 1930  Fox Film Corp.
(Eff. 5/11/28)
Nov. 14, 1930  Fox Hearst Corp.
(Eff. 5/11/28)
Nov. 24, 1930  Balsley & Phillips, Inc., Ltd.
    Terminated May 31, 1932.

The recording licensees listed above represented approximately 90 per cent. of the producers and 40 per cent. of the reproducers. A comparison of the film production of the licensees of Products with nonlicensees for the years 1927 to 1933 shows:

Products' licensees ............................. 57%
Nonlicensees ..................................... 43%

All of Products' recording licenses were in standard form except those to Vitaphone and Fox-Case Corporation. By the standard form Products granted to each recording licensee a nonexclusive license within the United States under all its existing and future patents:

"(1) To use * * * the recording equipment to be leased by Products to licensees * * * for making master records and sound records therefrom for motion picture audience purposes.

"(2) To use the reproducing and testing equipment to be leased by Products to licensee * * * for examining and testing sound records and for reproducing sound therefrom in licensees' own studios and private projection rooms.

"(3) To use, lease and sell sound records produced by licensee * * * for the reproduction of sound for motion picture audience purposes, and also to use, lease and sell, for the purposes aforesaid, sound records produced by other licensees of Products * * *."

Each recording licensee received in addition (1) the benefit of Products' continued research and development work; (2) patent protection; and (3) licenses under all patents in the same field which other licensees may own or control. The sections alleged by plaintiffs to contain illegal restraints are set forth in hæc verba in the footnote.[1]

---

[1] Article II.

Section 1. *Licenses granted by Products.*

(a) Products hereby grants and agrees to grant to Licensee, under the patents referred to in paragraph (e) of this Section and upon the terms and conditions and with the exceptions herein stated, the non-exclusive license within the United States for the following uses and purposes, but not otherwise:

(1) To use for the purposes and in the manner contemplated by this agreement the recording equipment to be leased by Products to Licensee as herein provided, for making master records and sound records therefrom for motion picture audience purposes.

(2) To use the reproducing and testing equipment to be leased by Products to Licensee as herein provided, for examining and testing sound records and for reproducing sound therefrom in Licensee's own studios and private projection rooms.

(3) To use, lease and sell sound records produced by Licensee with said recording equipment or made from master records so produced, for the reproduction of sound for motion picture audience purposes, and also to use, lease and sell, for the purposes aforesaid, sound records produced by other licensees of Products or made from master records produced by such other licensees.

(d) Licensee recognizes the highly technical nature of the said methods, systems and equipments, and of the art of recording and reproducing sound for the purposes herein contemplated, and that the production of sound records under the licenses herein granted and·the reproduction of sound from such records by the use of equipment or with methods and systems other than those prescribed by Products, may produce results of such inferior quality as to seriously impair the prestige and business reputation of the parties hereto, and also that uses of said equipments otherwise than as herein licensed may involve infringement of patent rights of third parties. Therefore, in order to secure and insure the proper pro-

In this standard recording license royalties were reserved with respect to three types of sound records:

1. Where the sound records were for reproduction in synchronism with the motion picture, other than a newsreel, the royalty was $500 for each one thousand linear feet of the aggregate length of the negative film of the related picture as cut for release printing.

2. Where the sound records were for use with newsreels the royalty was at the rate of $100 for each one thousand linear feet or fraction thereof of the aggregate length of the negative film of the related newsreel.

3. Where the sound records were for use independently of motion pictures, the royalty was at the rate of $500 for each master record from which such sound records not exceeding ten minutes of playing time at normal speed were made and $500 for each additional ten minutes.

The annual minimum royalty payable by each important producer was $100,000. These recording licenses were to continue

---

duction of sound records made hereunder and the proper reproduction of sound from such records to the satisfaction of the parties hereto, Licensee agrees that it will use the recording equipment to be leased to it by Products as herein provided, pursuant to the methods and systems and in the manner prescribed by Products from time to time, and that it will distribute sound records made hereunder only for use with, on, or in connection with, reproducing equipment which operates properly, reliably and efficiently to reproduce sound from sound records made hereunder, with adequate volume and of quality equal to that obtained by the use of equipment supplied by Products.

### Article III.

**Section 1.** *Amount of Royalties.*

(b) In addition to the specific compensation and payments otherwise provided in this agreement to be made by Licensee to Products, Licensee shall (where sound records produced or distributed by Licensee or its associated companies are made with the use of any of the technical information supplied by Products hereunder or by or with any equipment, method or system covered by any of the patents or embodying any of the inventions in respect of which any licenses are herein granted or agreed to be granted to Licensee) pay to Products the following royalties:

(1) Where such sound records shall be produced or distributed as aforesaid for use in reproducing sound in synchronism or timed relation with, or as an accompaniment to, any motion picture of whatever character, other than news reels, said royalty shall be Five hundred dollars ($500.00) for each one thousand (1,-000) linear feet or fraction thereof in the aggregate length of the negative film of each such picture as cut for release printing, (whether all of such picture or only a part thereof is accompanied by sound), except that in the case of such a motion picture which exceeds in its aggregate length five thousand (5,000) linear feet

of said film and furthermore exceeds in such aggregate length any multiple of one thousand (1,000) feet by a fractional part thereof, such fractional part of one thousand (1,000) feet shall be free of royalty where it does not exceed two hundred (200) feet.

(2) Where such sound records shall be produced or distributed as aforesaid for use with news reels said royalty shall be One hundred dollars ($100.00) for each one thousand (1,000) linear feet or fraction thereof in the aggregate length of the negative film of each news reel as cut for release printing, whether all of such news reel or only a part thereof is accompanied by sound.

(3) Where such sound records shall be produced or distributed as aforesaid for use independently of specific motion pictures, or for any use not specifically covered by subparagraphs (1) and (2) of this paragraph (b), said royalty shall be Five Hundred Dollars ($500.00) for each master record from which such sound records not exceeding ten (10) minutes of playing time at normal speed are made, and Five Hundred Dollars ($500.00) for each additional ten (10) minutes or fraction of ten (10) minutes of such playing time represented in such master record.

(d) Licensee agrees to pay as minimum amounts of royalty hereunder One Hundred thousand Dollars ($100,000) for each complete calendar year royalty period, and a sum for each royalty period of less than a calendar year which shall be in the same ratio to One Hundred thousand Dollars ($100,000) as such royalty period of less than a calendar year is to the entire calendar year, subject to the provisions contained in paragraphs (f) and (g) of this section.

(g) Licensee shall have the option at the end of five years from the date the first royalty period hereunder begins, to discontinue the production of master records for the remaining period of this contract and be thereafter relieved of the requirement as to minimum royalty hereunder; provided, however, that such op-

until December 31, 1944, and thereafter unless terminated by two years' notice. The film for an average normal feature picture consists of seven to eight thousand feet of negative film as cut for release printing. The royalty payable for the average feature production is at the rate of $500 for each thousand feet of negative film as cut for release printing, or from $3,500 to $4,000. This royalty item is insignificant compared with the other items of cost such as the amount paid to directors, to the distributor, to the stars in the cast, and for advertising.

### Equality Clause.

This standard recording license contained the "equality clause," one of the particular objects of plaintiffs' attack. It reads: "Licensee recognizes the highly

tion may be exercised only upon the following conditions:

(1) That Licensee shall have determined in good faith that the further production of master records and sound records made therefrom is not a profitable undertaking for it;

(2) That said option shall be available for Licensee for the period of six months only after the end of said five years and shall be exercised only upon written notice from Licensee to Products;

(3) That Licensee shall not be in default under the provisions of this contract;

(4) That at the date of the exercise of said option there shall have been equipped with Products' reproducing equipment a number of theatres owned, controlled, or operated by Licensee or its associated companies equal to at least sixty per cent. (60%) of the total number of theatres which are so owned, controlled, or operated at the date of this agreement.

### Article V.

Section 9. *Remedies for Default.*

(b) If Licensee shall be in default in the performance of any of its obligations hereunder (other than those referred to in paragraph (a) immediately above), Products may give notice in writing of such default to Licensee and unless Licensee shall within sixty (60) days thereafter either remove the default or deny in writing that the same has existed or exists, the rights and licenses of Licensee hereunder may, at the option of Products, be terminated at the expiration of sixty (60) days from the date of the written notice first above mentioned. If Licensee shall deny that such default has existed or exists, the dispute or controversy with reference thereto between Licensee and Products shall be referred to arbitration, pursuant to the provisions of Section 11 of this Article hereof, and in the determination of said question, the arbitrators shall have power to decide whether the rights of Licensee hereunder should be terminated and damages awarded if a default shall be found to have ex-

isted or to exist, or to impose such other penalty as in their judgment is proper;

Provided, however, that termination of this agreement by Products in accordance with the provisions of this section, or of any other section hereof, otherwise than as a result of an arbitration, shall not preclude Products from recovering damages at law in respect of the breach, default, failure or non-compliance by Licensee on account of which such termination is made. Upon any termination of the license of Licensee hereunder in accordance with the provisions hereof, Products shall have the right to repossess any and all equipments to which title has been retained by Products and which have been furnished, leased or otherwise provided for Licensee by Products pursuant to the provisions hereof, and upon such termination any and all rights of Licensee under this agreement shall cease and terminate, and in the event of any termination of this agreement or of the license to Licensee hereunder by reason of the default of Licensee, Licensee shall not thereafter distribute or use any of the sound records produced hereunder.

Section 13. *Duration.*

This agreement shall become effective as of the date hereof and shall continue in force until the 31st day of December, 1944, and thereafter unless terminated as herein provided. Either party may terminate this agreement on the 31st day of December, 1944, or as of the 31st day of December of any year thereafter by giving to the other party two years prior notice in writing of its intention so to do. It is agreed, however, that after termination of this agreement, otherwise than by reason of the default of Licensee, sound records made from master records produced prior to the date of such termination which fall within sub-paragraphs (1) and (2) of paragraph (b) of Section 1, Article III hereof may be distributed and used but only with the picture or news reel for which they were produced, and those which fall within sub-paragraph (3) of paragraph (b) of Section 1, Article III hereof may be distributed and used for not more than two years after the date such termination is effective.

technical nature of the said methods, systems and equipments, and of the art of recording and reproducing sound for the purposes herein contemplated, and that the production of sound records under the licenses herein granted and the reproduction of sound from such sound records by the use of equipment or with methods and systems other than those prescribed by Products, may produce results of such inferior quality as to seriously impair the prestige and business reputation of the parties hereto, and also that uses of said equipments otherwise than as herein licensed may involve infringement of patent rights of third parties. · Therefore, in order to secure and insure the proper production of sound records made hereunder and the proper reproduction of sound from such records to the satisfaction of the parties hereto, Licensee agrees that it will use the recording equipment to be leased to it by Products as herein provided, pursuant to the methods and systems and in the manner prescribed by Products from time to time, and· that it will distribute sound records made hereunder only for use with, on, or in connection with, reproducing equipment which operates properly, reliably and efficiently to reproduce sound from sound records made hereunder, with adequate volume and of quality equal to that obtained by the use of equipment supplied by Products."

The question arose at once as to the practice which should be followed under the equality clause. The producers brought it up in October, 1928, as soon as the problem became a practical one. A committee of the producers headed by Ludvigh, who was on the Paramount legal staff, met George Pratt, who was general counsel of Products. Without any hesitation Pratt recognized the reasonableness of the producers' inquiry. They went to work promptly to develop a working formula which would satisfy the requirements of the producers. After a short period of negotiation, they reached 'an agreement that each recording licensee should be the judge of the fitness of sound reproducing apparatus installed in any theatre. If Products was dissatisfied with the judgment of the recording 'licensee, it was to so notify the licensee. If the two could not agree, the matter was left to arbitration. This understanding is embodied in a letter dated December 14, 1928, addressed to each recording licensee of Products, as follows:

" * * * The question has been raised as to the practical method of working under the above provision. In order to provide a workable arrangement we are quite willing to leave it to your discretion to make contracts for the furnishing of sound records made under our license for any given theatre where you have reasonable assurance and belief that such sound records will be used on reproducing equipment which reasonably meets the standard set forth in the above mentioned provision.

"In order that we may have an opportunity to judge of the quality of reproductions you agree to notify us from time to time of the locations of reproducing equipments other than ours upon which you propose to permit your productions to be used. In any case in which we think that the reproduction does not reasonably meet the standard set forth in the above provision we will advise you, and in the event that you agree with our opinion you will make every reasonable endeavor to have the reproduction improved so that it does meet such standard.

"If the reproduction by means of such particular equipment is not made to meet such standard, or in the event of a decision to such effect under arbitration as hereinafter referred to, then we understand that you will not enter into· further contracts for furnishing to the particular theatre sound records made under our license, after the fulfillment of any then existing contracts, unless, of course, such quality is thereafter improved so as to meet the standard provided. In the event that we are unable to agree as to quality of reproduction in any given case and the question of quality is deemed of sufficient importance by either of us, it may be the subject of arbitration under the contract, but such arbitration, while following the procedural provisions under the contract, shall be limited to a finding as to whether or not the reproducing equipment in the instant case reasonably complies with ·the provision of our contract first above mentioned."

### Contractual Letter.

The record shows that there never was any disagreement between Products and its licensees respecting service of pictures

to any particular theatre. There was no arbitration or award. The recording licensees distributed films to whomsoever they pleased. At the trial ten exhibitors using non-Products equipment (three witnesses of plaintiff and seven of defendant) testified. They came from the Pacific Coast, the Far Middle West, the Middle South, New England, New York, Philadelphia, and Wilmington. They were big and little exhibitors. Only one testified that he had ever experienced the slightest difficulty in getting pictures from recording licensees of Products for exhibition on his non-Products equipment. That one exception was Perelman of West Allegheny, Pa. In the early part of 1929 he testified he put in two or three DeForest equipments and that Paramount was reluctant to release its pictures for showing on those equipments. During that period he had no difficulty with other recording licensees of Products. However, by April, 1929, six years before this trial began, he obtained Paramount pictures. After April, 1929, he never had any difficulty with Paramount. At no time did he have difficulty with any of the other recording licensees.

The full and free distribution by Products' licensees of their pictures to non-Products equipped theatres is clearly demonstrated by the following tabulation:

Columbia:
1928-1929 ........................................... 1547
1929-1930 ........................................... 3661
1930-1931 ........................................... 4205
Fox:
Sept. 1, 1928, to Dec. 31, 1929......................... 2180
Jan. 1, 1930, to May 31, 1930.......................... 4574
June 1, 1930, to Sept. 1, 1931......................... 5769
Metro-Goldwyn:
Jan. 1, 1929, to Sept. 4, 1929......................... 1459
Sept. 5, 1929, to Sept. 4, 1930......................... 4879
Sept. 5, 1930, to Sept. 4, 1931......................... 4116
Paramount:
Year 1928 ........................................... 133
Year 1929 ........................................... 2631
Jan. 1, 1930, to June 30, 1930......................... 3849
July 1, 1930, to April 30, 1931........................ 4932
May 1, 1931, to Jan. 31, 1932.......................... 4170
United Artists:
Sept. 5, 1928, to Sept. 4, 1929......................... 2480
Sept. 5, 1929, to Sept. 4, 1930......................... 5097
Sept. 5, 1930, to Sept. 1, 1931......................... 6767
Sept. 1, 1931, to Sept. 1, 1932......................... 4716
Universal:
Sept. 5, 1928, to Sept. 4, 1929......................... 238
Sept. 5, 1929, to Sept. 4, 1930......................... 2979
Jan. 1, 1931, to Dec. 31, 1931......................... 229
Feb. 1, 1932, to Sept. 1, 1932......................... 102

The recording licenses entailed very large expenditures by the licensees for sound equipment, for rebuilding their studios, and other items. Prompt manufacture and delivery of theatre apparatus by a responsible manufacturer was an essential condition. Prompt manufacture and delivery involved the immediate change by Western of its manufacturing operations from those of a laboratory character to those of quantity production. This involved the designing and manufacture of tools, machinery, and equipment at a very substantial cost. There was also a large expenditure for materials and skilled labor in the manufacture of sound apparatus and in training an adequate organization for the installation and servicing of the apparatus. In advance of making such large expenditures it was reasonable that the recording licensees assure to Western and Products a volume of business which would justify the engineering and manufacturing demanded of them. To meet this situation contractual letters signed by Products and accepted by the recording licensees contained the provisions:

"5. In order to promote the use of sound records in connection with motion pictures, and to make an adequate market for your productions and for our reproducing equipments, you agree that all theatres operated by you or by your associated companies shall install our reproducing equipments (which you agree are hereby adopted as the standard equipment for such purposes), wherever and as rapidly as in your judgment conditions permit, and we will supply such equipments as rapidly as we are able to after receipt of orders therefor, taking into account our other commitments, but as respects orders for reproducing equipment given us by you during the calendar year 1928 (other than your initial order which is now being placed with us) we agree that we will, subject to the provisions of our standard exhibitors' license agreements, install up to fifty of said equipments not later than four months after date of receipt of order. You further agree to promote in every reasonable manner the installation of our reproducing equipments in motion picture theatres.

"6. We agree to furnish to you and your associated companies from time to time during the period of the recording license agreement, reproducing equipment at our current prevailing charges for such

equipment, and you and your associated companies agree to lease the same from us upon such basis. * * * "

In the early part of 1928 the customers for sound reproducing apparatus were about 15,000 theatres. Theatres owned or controlled by the recording licensees of Products were about 2,000. Since the contractual letters were executed, one of the recording licensees had disposed of all its theatres totaling 300 or 400. Other chains of theatres affiliated with Products' licensees have been broken up. The total number of theatres now controlled by Products' licensees will not exceed 10 per cent. of all the theatres in the United States equipped with sound apparatus.

The consistent practice under the equality clause over a period of nearly eight years is conclusive as to what it means and what the parties have interpreted it to mean. There is no suggestion in the record that any exhibitor had any trouble in getting pictures on account of the equality clause with the one exception of Perelman for three months in 1929. If this clause had operated as plaintiffs' claim, it is unbelievable that there would not have been abundant evidence of it from some of the thousands of non-Products theatres. There is no evidence that exhibitors were restrained from taking plaintiff's apparatus because of fear of their inability to get pictures from Products' licensees.

### Servicing Equipment.

After the recording licenses were made in 1928, Western organized its manufacturing facilities to meet the demands for immediate delivery. Products created an organization for installing sound apparatus in studios and theatres. It trained staffs of the recording licensees to operate the equipment.

Sound reproducing apparatus furnished by Products to exhibitors is a complicated and delicate assembly consisting of some 3,400 parts. In 1928 exhibitors were in complete ignorance respecting the nature and characteristics of sound reproducing apparatus as well as its maintenance requirements. Products serviced the equipment it furnished. This service was necessary to enable exhibitors to operate the apparatus without continual interruptions and breakdowns. Performances lacking uniform quality would have discredited sound pictures with the public and ruined the enterprise. The necessity of adequate service of the equipment after installation was obvious. Accordingly Products established a service organization with related engineering activities. This involved the selection and training of men suited for the job and the establishment throughout the United States of supplies of repair and replacement parts. At the peak of the business the service engineers numbered 1,000. Theatre equipments were regularly inspected and adjusted.

In addition, Products organized an engineering department to improve the sound entertainment offered in the theatres. Products spent over $8,000,000 to improve sound pictures. Due to the research carried on by Products the art has advanced very far since the first recording equipments were installed.

After the Producer licenses were made in 1928, there was a widespread demand for the installation of sound reproducing apparatus in theatres. In the summer of that year advertisements of reproducing equipment competitive with Products' appeared in the public press. By August of 1929, 3,635 competitive reproducing equipments were installed. By the end of that year 4,843 such equipments were installed, manufactured by over 200 concerns. A record of installations of reproducing equipment by Products and by Products' competitors shows:

|  | Installations by Products | Installations by Products' Competitors |
|---|---|---|
| August 1, 1929 | 2,402 | 3,635 |
| January 10, 1930 | 3,875 | 4,843 |
| January 1, 1931 | 4,844 | 8,284 |
| January 1, 1932 | 5,537 | 8,343 |

At present Products' sound reproducing equipments number 5,293 in a total of 15,273 theatres in the United States.

All sound reproducing equipments installed by Products are leased to exhibitors. The terms of the leases vary. Some are for ten years; some are for ten years with right of cancellation during the term; some are for three years; and some are for one year. A few run for fifteen years under a nominal rent. All leases were standard when executed. From time to time changes were made in the form.

Leases of reproducing equipment show a progressive liberality and absence of re-

straint. Forms 283TS, 284TS, and 285TS contained a provision: "The Exhibitor shall not \* \* \* operate, use or employ the Equipment in any manner in conjunction with any record of sound or with any other device or combination of devices in any way related to the production or reproduction of sound, unless said records, devices and combinations of devices (other than those made under license from Products for such use) shall have been first tested by Products and found by it to operate properly, reliably and efficiently and to reproduce sound with accuracy of quality and adequacy of volume, and approved by the legal counsel of Products as to freedom from infringement of patents."

Forms 283TS and 284TS were adopted in January, 1928, and none are now in effect. Form 285TS was adopted in March, 1928, and only 87 are now in force.

### Repair and Replacement Clause.

There are 5,293 leases by Products of sound reproducing apparatus now in force; 4,138 of these contain the following "Repair and Replacement" provision: "The Exhibitor recognizes the highly technical mechanism and art involved in the inventions and construction of the Equipment, and in the making of sound records (in any form) for use therewith, and that the prestige and business reputation · of Products might be seriously affected by imperfect operation of the Equipment or by its use with sound records which are not suited to it or which produce inferior results when used with the Equipment, and that use of said Equipment otherwise than as herein licensed may involve infringement of patent rights. Therefore, in order to secure and insure the functioning of the Equipment to the satisfaction of the parties hereto, the Exhibitor shall not, without the written consent of Products move, alter, change or modify the Equipment, nor add anything thereto nor take anything therefrom: \* \* \*. Also, in order further to secure proper functioning of the Equipment as aforesaid satisfactorily to the parties hereto, it is agreed that all additional and renewal parts and assembled parts for the Equipment shall be obtained from Products and that all repairs to the Equipment shall be made as specified by Products."

This clause with immaterial variations was contained in all lease forms employed by Products prior to May 23, 1932. Since that date Products has formulated and put into use sixteen lease forms from all of which this provision or the equivalent thereof has been omitted.

When exhibitors had no knowledge of the character of the sound apparatus or the risks which would attend the use with such apparatus of unsuitable parts, the preservation of the integrity of the theatre equipment was a vital necessity. During the latter part of 1928 great difficulty was experienced with the machines in operation. Breakdowns were of constant occurrence. So serious was the situation that in the early part of 1929 Products' entire engineering force was organized in a campaign to bring about uninterrupted and satisfactory performances. This effort continued over a long period. . Under all of these conditions the adoption and use by Products of the renewal and replacement parts clause of the theatre leases was reasonable.

From its experience with breakdowns Products saw the necessity of providing for the furnishing of renewal and replacement parts as a necessary service to the theatres in· aid of consistent performances of satisfactory quality. The evidence shows that this was not a merchandising business conducted for profit. Regardless of the expense involved Products established stock of renewal and replacements parts at twenty-two different points in the United States. The turn-over in the greater portion of these parts was negligible and the cost of carrying them in stock was a continuing expense. Products also maintained a department in which exhaustive studies were carried on directed to the reduction of expenses and expenditures for repair and replacement parts. As a result of Products' attention to exhibitors' costs for repair and replacement parts such cost has been brought down from a weekly average per theatre of $12.65 in 1928 to $1.06 in 1933 and to $1.89 in 1934. No other manufacturer has attempted to make or furnish a complete line of parts for theatre equipment. Other manufacturers have confined their attention to a few parts such as vacuum tubes, photoelectric cells, sprockets, and gears, in which the turn-over is relatively large. Parts available to exhibitors from manufacturers other than Products

do not aggregate more than 2 per cent. of all of the parts required. The net result to Products of its business in furnishing parts with its small volume and high operating expense has not shown a profit.

Competitive parts began to appear late in 1930 or early in 1931. Products told exhibitors that it could not be responsible for the quality of these parts. In September, 1930, a bulletin was issued advising exhibitors that a charge of $35 would be made for each emergency call made necessary by a breakdown of the theatre system caused by a defect in a part not furnished by Products. As competing manufacturers of parts gained greater knowledge and as the personnel of the theatres became very much more capable in operating and maintaining the equipment Products' practice with respect to the use of competitive parts by exhibitors was relaxed. For a long time prior to the trial of this case, there were available to exhibitors competitive parts which could be used without serious embarrassment in the performance of the equipment and these parts have been freely used by exhibitors without objection from Products.

June 28, 1933, an opinion of this court on motions for preliminary injunctions was filed. 4 F.Supp. 80. It declared these clauses relating to repair and replacement parts illegal as in violation of the Clayton Act. November 15, 1933, these clauses were waived by Products in the following letter:

"Gentlemen: In our letter of August 2, 1933 concerning an order of the Federal Court in Wilmington, Delaware, in certain suits brought against us by the Stanley Company of America, General Talking Pictures Corporation and Duovac Radio Corporation, we informed you that the order of the Court provided that upon the Plaintiffs giving bond, preliminary injunctions would issue against the enforcement of the provisions contained in most of the theatre equipment contracts obligating exhibitors to obtain from us all additional and renewal parts and assembled parts required for the operation of the equipment.

"To date the Plaintiffs have given no bond, and therefore no injunction has issued. Moreover we have never enforced these clauses.

"However, this situation has caused some confusion among exhibitors regarding their contractual position. In order to clear this up we hereby formally notify you that we release you from and waive any and all provisions of our contract with you to the extent that they may be construed as requiring you to obtain such parts exclusively from us.

"This waiver is not to be construed as expanding the patent licenses granted in the contract or as implying the assumption by us of any patent or other liability caused by the use of parts not furnished by us."

### Law.

The "rule of reason" evolved in the earlier anti-trust cases as a rule for the interpretation of the Sherman and Clayton Acts has been given full expression in a recent opinion of the Supreme Court.

"There is no question as to the test to be applied in determining the legality of the defendants' conduct. The purpose of the Sherman Anti-Trust Act [15 U.S.C. A. §§ 1–7, 15 note] is to prevent undue restraints of interstate commerce, to maintain its appropriate freedom in the public interest, to afford protection from the subversive or coercive influences of monopolistic endeavor. As a charter of freedom, the act has a generality and adaptability comparable to that found to be desirable in constitutional provisions. It does not go into detailed definitions which might either work injury to legitimate enterprise or through particularization defeat its purposes by providing loopholes for escape. The restrictions the act imposes are not mechanical or artificial. Its general phrases, interpreted to attain its fundamental objects, set up the essential standard of reasonableness. They call for vigilance in the detection and frustration of all efforts unduly to restrain the free course of interstate commerce, but they do not seek to establish a mere delusive liberty either by making impossible the normal and fair expansion of that commerce or the adoption of reasonable measures to protect it from injurious and destructive practices and to promote competition upon a sound basis. The decisions establish, said this Court in Nash v. United States, 229 U.S. 373, 376, 33 S.Ct. 780, 781, 57 L.Ed. 1232, 'that only such contracts and combinations are within the act as, by reason of intent or the inherent

nature of the contemplated acts, prejudice the public interests by unduly restricting competition or unduly obstructing the course of trade.' * * *

"In applying this test, a close and objective scrutiny of particular conditions and purposes is necessary in each case. Realities must dominate the judgment. The mere fact that the parties to an agreement eliminate competition between themselves is not enough to condemn it. 'The legality of an agreement or regulation cannot be determined by so simple a test, as whether it restrains competition. Every agreement concerning trade, every regulation of trade, restrains.' Chicago Board of Trade v. United States, supra [246 U. S. 231, 38 S.Ct. 242, 62 L.Ed. 683]. The familiar illustrations of partnerships, and enterprises fairly integrated in the interest of the promotion of commerce, at once occur. The question of the application of the statute is one of intent and effect, and is not to be determined by arbitrary assumptions. It is therefore necessary in this instance to consider the economic conditions peculiar to the coal industry, the practices which have obtained, the nature of defendant's plan of making sales, the reasons which led to its adoption, and the probable consequences of the carrying out of that plan in relation to market prices and other matters affecting the public interest in interstate commerce in bituminous coal." Appalachian Coals, Inc., v. United States, 288 U.S. 344, 359, 53 S.Ct. 471, 474, 77 L.Ed. 825.

■ The "equality clause" and the "repair and replacement clause," hereinbefore found to be illegal tying clauses whenever employed in licenses and leases throughout the commercial period of the industry, are illegal because prohibited by the Clayton Act (38 Stat. 730). In the second Shoe Machinery Case the Supreme Court said:

"Turning to the decree, it will be found that the court enjoined the use of (1) the restrictive use clause, which provides that the leased machinery shall not, nor shall any part thereof, be used upon shoes, etc., or portions thereof, upon which certain other operations have not been performed on other machines of the defendants; (2) the exclusive use clause, which provides that if the lessee fails to use exclusively machinery of certain kinds made by the lessor, the lessor shall have the right to cancel the right to use all such machinery so leased; (3) the supplies clause, which provides that the lessee shall purchase supplies exclusively from the lessor; (4) the patent insole clause, which provides that the lessee shall only use machinery leased on shoes which have had certain other operations performed upon them by the defendants' machines; (5) the additional machinery clause, which provides that the lessee shall take all additional machinery for certain kinds of work from the lessor or lose his right to retain the machines which he has already leased; (6) the factory output clause, which requires the payment of a royalty on shoes operated upon by machines made by competitors; (7) the discriminatory royalty clause providing lower royalty for lessees who agree not to use certain machinery on shoes lasted on machines other than those leased from the lessor. The defendant's restrictive form of leases embraces the right of the lessor to cancel a lease for the breach of a provision in such lease, or in any other lease or license agreement between the lessor and the lessee. The lessor in such case is given the right, by notice in writing to the lessee, to terminate any and all leases or licenses then in force to use the machinery and this notwithstanding previous breaches or defaults may have been unnoticed, waived, or condoned by or on behalf of the lessor. * * *

"While the clauses enjoined do not contain specific agreements not to use the machinery of a competitor of the lessor, the practical effect of these drastic provisions is to prevent such use. We can entertain no doubt that such provisions as were enjoined are embraced in the broad terms of the Clayton Act, which cover all conditions, agreements, or understandings of this nature. That such restrictive and tying agreements must necessarily lessen competition and tend to monopoly is, we believe, equally apparent. When it is considered that the United Company occupies a dominating position in supplying shoe machinery of the classes involved, these covenants, signed by the lessee and binding upon him, effectually prevent him from acquiring the machinery of a competitor of the lessor, except at the risk of forfeiting the right to use the machines furnished by the United Company, which may be absolutely essential to the prose·cution and success of his business.

"This system of 'tying' restrictions is quite as effective as express covenants could be, and practically compels the use of the machinery of the lessor, except upon risks which manufacturers will not willingly incur. It is true that the record discloses that in many instances these provisions were not enforced. In some cases they were. In frequent instances it was sufficient to call the attention of the lessee to the fact that they were contained in the lease to insure a compliance with their provisions. The power to enforce them is omnipresent, and their restraining influence constantly operates upon competitors and lessees. The fact that the lessor in many instances forbore to enforce these provisions does not make them any less agreements within the condemnation of the Clayton Act." United Shoe Mach. Corp. v. United States, 258 U.S. 451, 456, 42 S.Ct. 363, 365, 66 L.Ed. 708; Lord v. Radio Corporation of America (D.C.) 24 F.(2d) 565, affirmed (C.C.A.) 28 F.(2d) 257.

It is axiomatic that there is no unlawful restraint of trade when there is no trade. It is equally true that there is no unlawful restraint of trade in studio or theatre equipment when there is no competing equipment of adequate efficiency on the market. Equipment lacks adequate efficiency if it occasions or threatens breakdowns. This was the condition of the market when the "equality clause" and the "repair and replacement clause" were first used in Products' licenses and leases. These clauses were essential to start the industry. Then they were not unlawful restraints of trade.

After competitive equipment and apparatus of adequate efficiency became available to the industry in the "commercial period," it was incumbent upon Products to expunge from its licenses and leases the "equality clause." Likewise it was its duty to delete from its leases the clause relating to "repair and replacement parts." The equality clause was a restraint upon the trade in this equipment and apparatus. If an exhibitor must choose between Products' equipment and other equipment equally good, the exhibitor is constrained to acquire Products' equipment. Likewise the tying clause in Products' leases respecting "repair and replacement parts" is illegal. This clause is also a restraint of trade and is inhibited by the Clayton Act.

At the time of the hearing, these clauses had been abandoned by Products although not formally annulled. Standard Oil Co. v. United States, 283 U.S. 163, 181, 51 S.Ct. 421, 428, 75 L.Ed. 926, was a suit by the Government to enjoin alleged violations of the Sherman Act (15 U.S.C.A. §§ 1–7, 15 note) by means of an illegal combination and conspiracy to restrain interstate commerce in gasoline. The court said: "The remaining issues in the case have become moot. The Government objected to a number of early Indiana Company licenses which contained certain territorial restrictions on the production of cracked gasoline; and also to a provision in the first contract between primary defendants, and in licenses thereunder, by which the Indiana Company secured an option to purchase a portion of the cracked gasoline manufactured in, or shipped into, its sales territory. At the hearing before the District Court it appeared that these provisions had never been enforced. Upon the court's request the objectionable clauses were voluntarily cancelled some months before the entry of the decree. Similarly the propriety of certain blanket acknowledgments of patent validity in the first contract, and in a number of licenses under later contracts, were questioned by the lower court. At its suggestion, these provisions also were formally cancelled by the parties. As the relief here sought is an injunction, and hence relates only to the future. United States v. Hamburg-Amerikanische Packet-Fahrt-Actien Gesellschaft, 239 U. S. 466, 475, 36 S.Ct. 212, 60 L.Ed. 387; the alleged validity of such provisions has become moot."

In United States v. Kryptok Co. (D. C.) 11 F.(2d) 874, the Government sought to enjoin an alleged combination and conspiracy by the defendants in violation of the Sherman Act. Complaint was made of a provision in license agreements under patents made by one of defendants. At the time of trial it appeared that this provision had been abandoned by defendants. Judge Mack held: "This latter provision, however, while not formally annulled, has in fact been long since abandoned in practice, both as to price and jobbers' list determination. * * * The evidence of abandonment and lack of any desire or intent to put it into effect again is sufficient, in my judgment, to bar the injunctive relief as to these points."

667

■ Neither defendant American Telephone & Telegraph Company nor defendant Western Electric Company, Incorporated, was a party to any of the contracts containing the clauses the enforcement of which plaintiffs seek to enjoin herein. As to those two defendants the bill of complaint must be dismissed.

■ Upon the whole record the court finds that Products' licenses and leases made in the research and promotional period of the industry were not and are not illegal and void ab initio. The "equality clause" and the "repair and replacement clause" embodied in licenses and leases during the commercial period are illegal and void. In view of the practical abandonment of these clauses at the time of the hearing of these suits no injunction will issue in either suit. As to these clauses in licenses and leases now outstanding the present holding of the court that they are void and of no effect should advise the trade that no damage or threatened injury can arise therefrom in the future. But the court will retain jurisdiction of these cases for the purpose of taking such other action or adding to its decree such relief as may become necessary and appropriate, should any attempt be made by Products to enforce such clauses.

This opinion contains a statement of the essential facts and of the law applicable thereto in conformity with Equity Rule 70½, 28 U.S.C.A. following section 723.