## B. S. PEARSALL BUTTER CO. v. FEDERAL TRADE COMMISSION.

(Circuit Court of Appeals, Seventh Circuit. July 19, 1923.)

No. 3190.

1. **Monopolies ☞17(2)—Contract held one of sale within Clayton Act; "contract of sale."**

A contract between a manufacturer and wholesale dealer, by which the latter is given the exclusive right during its term to handle the product of the former in a specified territory, and agrees to sell such product exclusively, is in effect a "contract of sale," within Clayton Act, § 3 (Comp. St. § 8835c).

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Contract of Sale.]

2. **Monopolies ☞17(2)—Contracts between manufacturer of oleomargarine and wholesale dealers held not in violation of Clayton Act.**

Contracts between petitioner, one of 65 manufacturers of oleomargarine in the United States, making slightly more than 1 per cent. of the total product, and wholesale dealers, by which the latter are given exclusive sale of petitioner's product during their term in specified territory, and agree to sell no competing product during such term, but which place no restrictions on retailers, *held* not such as tend to create a monopoly, or to substantially lessen competition, in violation of Clayton Act, § 3 (Comp. St. § 8835c).

Petition to Review Order of Federal Trade Commission.

Petition of the B. S. Pearsall Butter Company to review an order of the Federal Trade Commission. Order set aside.

James M. Sheean, of Chicago, Ill., for petitioner.
Adrien F. Busick, of Washington, D. C., for respondent.

Before ALSCHULER, EVANS, and PAGE, Circuit Judges.

ALSCHULER, Circuit Judge. Petitioner complains of an order of the Federal Trade Commission directing petitioner to desist from—

"directly or indirectly using formal or informal contracts or understandings to the effect that purchasers or dealers in respondent's products shall not deal in the goods, wares, merchandise, supplies or other commodities of a competitor or competitors of respondent or in competing commodities."

The complaint originally charged petitioner with violating section 5 of the Federal Trade Commission Act (Comp. St. § 8836e) in the use of unfair methods of competition, and section 3 of the Clayton Act (Comp. St. § 8835c), in making contracts as hereinafter stated. By amendment the first charge was eliminated. Section 3 of the Clayton Act is as follows:

"It shall be unlawful for any person engaged in commerce in the course of such commerce, to lease or make a sale or contract for sale of goods, wares, merchandise, machinery, supplies or other commodities, * * * or fix a price charged therefor or discount from, or rebate upon, such price, on the condition, agreement or understanding that the lessee or purchaser thereof shall not use or deal in the goods, wares, merchandise, machinery, supplies or other commodities of a competitor or competitors of the lessor or seller, where the effect of such lease, sale, or contract for sale or such condition,

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

agreement or understanding may be to substantially lessen competition or tend to create a monopoly in any line of commerce."

The contract alleged to be violative of this section is:

"That the said party of the first part does hereby give to the said party of the second part, the exclusive sale of its brands of oleomargarine and nut margarine in the city of ―――― and vicinity for the period beginning on the 1st day of March, A. D. 1920, and ending on the last day of February, A. D. 1921. And the party of the second part agrees to wholesale party of the first party's brands of oleomargarine and nut margarine exclusively in the above territory during the period of this contract; second party also agreeing to actively and vigorously press to the best of their ability the sale of said products of first party, and to in every way promote a demand for them in the aforesaid territory. It is further agreed by the said party of the first part to refund one-half of the amount of the federal wholesale license ($100) when the party of the second part has sold 40,000 pounds of party of the first part's oleomargarine and nut margarine and the full amount of ($200) when they have sold 75,000 pounds of said party's oleomargarine and nut margarine during the period of this contract; also furnish specialty man for a couple of weeks, circularize the trade, furnish advertising literature, and do a reasonable amount of newspaper advertising."

It appears that there were in this country 65 manufacturers of margarine products, and that the total product for the year preceding the complaint against petitioner was 350,000,000 pounds, of which petitioner produced about 4,000,000, or slightly over 1 per cent. The largest producer, the Jelke Company, of Chicago, 55,000,000 pounds, are extensive advertisers and do not make exclusive agreements for the handling of their product. The five big Chicago packers, who with Jelke manufacture the large bulk of this product, distribute to the trade largely through their own local branches. About 20 of the other manufacturers used contracts more or less similar, and most of the rest of them have some kind of understanding for exclusive representation with the various jobbers who handle their product. There was no evidence of any improper practices on the part of petitioner, or of harmful result of its contract either to other manufacturers, dealers, or the public, save only as might be gathered from the contract itself.

[1] It is contended for petitioner that its contract does not constitute "a sale or contract for sale of goods" and therefore does not fall within the provisions of section 3, and that under this record the effect of the contract, if of sale, may not "be to substantially lessen competition or tend to create a monopoly." The agreement may be lacking in elements which would technically make it a contract for sale of goods, such as price and quantity, but it provides a basis for sales under which the parties acted and sales between them were being made, and for the purposes hereof they should not be heard to deny that it was in fact a contract for sale of goods within the purview of section 3 of the Clayton Act. In this respect we think it falls fairly within the recent decision of the Supreme Court in Standard Fashion Co. v. Magrane-Houston Co., 258 U. S. 346, 42 Sup. Ct. 360, 66 L. Ed. 653. The contract in that case held to be violative of section 3 of the Clayton Act has much similarity to the one here under consideration.

292 F.—46

[2] But the circumstances there appearing, and which were manifestly influential in the result there reached, when compared with those here disclosed, require a different disposition hereof. In commenting on the effect of the phrase in section 3, "*may* be to substantially lessen competition" the court said:

"Section 3 condemns sales or agreements where the effect of such sale or contract of sale 'may' be to substantially lessen competition or tend to create monopoly. It thus deals with consequences to follow the making of the restrictive covenant limiting the right of the purchaser to deal in the goods of the seller only. But we do not think that the purpose in using the word 'may' was to prohibit the mere possibility of the consequences described. It was intended to prevent such agreements as would under the circumstances disclosed probably lessen competition, or create an actual tendency to monopoly. That it was not intended to reach every remote lessening of competition is shown in the requirement that such lessening must be substantial.

"Both courts below found that the contract interpreted in the light of the circumstances surrounding the making of it was within the provisions of the Clayton Act as one which substantially lessened competition and tended to create monopoly. These courts put special stress upon the fact found that, of 52,000 so-called pattern agencies in the entire country, the petitioner, or a holding company controlling it and two other pattern companies, approximately controlled two-fifths of such agencies. As the Circuit Court of Appeals summarizing the matter pertinently observed: 'The restriction of each merchant to one pattern manufacturer must in hundreds, perhaps in thousands, of small communities amount to giving such single pattern manufacturer a monopoly of the business in such community. Even in the larger cities, to limit to a single pattern maker the pattern business of dealers most resorted to by customers whose purchases tend to give fashions their vogue, may tend to facilitate further combinations; so that the plaintiff, or some other aggressive concern, instead of controlling two-fifths, will shortly have almost, if not quite, all the pattern business.'"

The record in the case at bar discloses no facts or circumstances which would justify the conclusion that there was here shown more than "the mere possibility of the consequences described." We find nothing from which it might be deduced that the agreement here "would under the circumstances disclosed possibly lessen competition or create an actual tendency to monopoly." Petitioner is comparatively and in fact a small factor in the margarine business of the country—about 1 per cent. of the entire production. There does not appear to be anything distinctive about its product—nothing which could not readily be supplied by many other makers of this apparently standardized product. Petitioner does not occupy "a dominant position" in that line of commerce, as was the case in United Shoe Mach. Co. v. United States, 258 U. S. 451, 42 Sup. Ct. 363, 66 L. Ed. 708. And it cannot be here said, as in the last-named case, that to its customer its particular product "may be absolutely essential to the prosecution and success of his business."

It is interesting here to note that it was only five years previous that petitioner entered into this doubtless then well standardized business, in competition with many others, most of whom have arrangements with their jobbers more or less similar, and that in the face of this competition, in such brief time built up a business of about 4,-000,000 pounds for its last year. From this it may well appear that the similar practice by others in the same class did not result in stifling

of competition and monopolizing the trade to the substantial or serious detriment of this recent entrant therein. Nothing here appears to indicate that the ultimate distributor of the product, the retailer, is in any way bound or restricted. He is generally familiar with the market, and with the ways and means of transportation of commodities, and if he desires in his business to handle the product of other makers he is at liberty to procure it—from the maker himself or from those who handle it.

Most of the witnesses unite in saying that in the handling of this product there is advantage to manufacturer, jobber, retailer, and the public in having a particular brand handled exclusively by one jobber in a given locality wherein he handles no other similar product, and while one or two did say, on being examined as to the result of such a contract, that it might restrict competition, it is evident that they meant no more than that the employment of such contracts might in some circumstances so result. Under the particular facts which this record discloses, it is our view that the contract in question, as employed by this petitioner, does not fall under the condemnation of section 3 of the Clayton Act.

The order herein of the Federal Trade Commission is reversed, and it is directed that the complaint herein against petitioner be dismissed.