# STANDARD OIL COMPANY OF CALIFORNIA ET AL. *v.* UNITED STATES.

No. 279.   Argued March 3-4, 1949.—Decided June 13, 1949.

*John M. Hall* argued the cause for appellants. With him on the brief was *Marshall P. Madison.*

*Assistant Attorney General Bergson* argued the cause for the United States. With him on the brief were *Solicitor General Perlman, Walker Smith, Robert G. Seaks* and *Stanley M. Silverberg.*

MR. JUSTICE FRANKFURTER delivered the opinion of the Court.

This is an appeal to review a decree enjoining the Standard Oil Company of California and its wholly-owned subsidiary, Standard Stations, Inc.,[1] from enforcing or entering into exclusive supply contracts with any independent dealer in petroleum products and automobile accessories. 78 F. Supp. 850. The use of such contracts was successfully assailed by the United States as violative of § 1 of the Sherman Act[2] and § 3 of the Clayton Act.[3]

---

[1] Standard Stations, Inc., has no independent status in these proceedings; since 1944 its activities have been confined to managing service stations owned by the Standard Oil Co. of California.

[2] "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is hereby declared to be illegal: . . . ." 26 Stat. 209, as amended, 50 Stat. 693, 15 U. S. C. § 1.

[3] "It shall be unlawful for any person engaged in commerce, in the course of such commerce, to lease or make a sale or contract for sale of goods, wares, merchandise, machinery, supplies, or other commodities, whether patented or unpatented, for use, consumption, or resale within the United States or any Territory thereof or the

The Standard Oil Company of California, a Delaware corporation, owns petroleum-producing resources and refining plants in California and sells petroleum products in what has been termed in these proceedings the "Western area"—Arizona, California, Idaho, Nevada, Oregon, Utah and Washington. It sells through its own service stations, to the operators of independent service stations, and to industrial users. It is the largest seller of gasoline in the area. In 1946 its combined sales amounted to 23% of the total taxable gallonage sold there in that year: sales by company-owned service stations constituted 6.8% of the total, sales under exclusive dealing contracts with independent service stations, 6.7% of the total; the remainder were sales to industrial users. Retail service-station sales by Standard's six leading competitors absorbed 42.5% of the total taxable gallonage; the remaining retail sales were divided between more than seventy small companies. It is undisputed that Standard's major competitors employ similar exclusive dealing arrangements. In 1948 only 1.6% of retail outlets were what is known as "split-pump" stations, that is, sold the gasoline of more than one supplier.

Exclusive supply contracts with Standard had been entered into, as of March 12, 1947, by the operators of 5,937 independent stations, or 16% of the retail gasoline outlets in the Western area, which purchased from Standard in 1947, $57,646,233 worth of gasoline and

District of Columbia or any insular possession or other place under the jurisdiction of the United States, or fix a price charged therefor, or discount from, or rebate upon, such price, on the condition, agreement, or understanding that the lessee or purchaser thereof shall not use or deal in the goods, wares, merchandise, machinery, supplies, or other commodities of a competitor or competitors of the lessor or seller, where the effect of such lease, sale, or contract for sale or such condition, agreement, or understanding may be to substantially lessen competition or tend to create a monopoly in any line of commerce." 38 Stat. 731, 15 U. S. C. § 14.

$8,200,089.21 worth of other products. Some outlets are covered by more than one contract so that in all about 8,000 exclusive supply contracts are here in issue. These are of several types, but a feature common to each is the dealer's undertaking to purchase from Standard all his requirements of one or more products. Two types, covering 2,777 outlets, bind the dealer to purchase of Standard all his requirements of gasoline and other petroleum products as well as tires, tubes, and batteries. The remaining written agreements, 4,368 in number, bind the dealer to purchase of Standard all his requirements of petroleum products only. It was also found that independent dealers had entered 742 oral contracts by which they agreed to sell only Standard's gasoline. In some instances dealers who contracted to purchase from Standard all their requirements of tires, tubes, and batteries, had also orally agreed to purchase of Standard their requirements of other automobile accessories. Of the written agreements, 2,712 were for varying specified terms; the rest were effective from year to year but terminable "at the end of the first 6 months of any contract year, or at the end of any such year, by giving to the other at least 30 days prior thereto written notice . . . ." Before 1934 Standard's sales of petroleum products through independent service stations were made pursuant to agency agreements, but in that year Standard adopted the first of its several requirements-purchase contract forms, and by 1938 requirements contracts had wholly superseded the agency method of distribution.

Between 1936 and 1946 Standard's sales of gasoline through independent dealers remained at a practically constant proportion of the area's total sales; its sales of lubricating oil declined slightly during that period from 6.2% to 5% of the total. Its proportionate sales of tires and batteries for 1946 were slightly higher than they were in 1936, though somewhat lower than for some

intervening years; they have never, as to either of these products, exceeded 2% of the total sales in the Western area.

Since § 3 of the Clayton Act was directed to prohibiting specific practices even though not covered by the broad terms of the Sherman Act,[4] it is appropriate to consider first whether the enjoined contracts fall within the prohibition of the narrower Act. The relevant provisions of § 3 are:

> "It shall be unlawful for any person engaged in commerce, in the course of such commerce, to lease or make a sale or contract for sale of goods, wares, merchandise, machinery, supplies, or other commodities, whether patented or unpatented, for use, consumption, or resale within the United States . . . on the condition, agreement, or understanding that the lessee or purchaser thereof shall not use or deal in the goods . . . of a competitor or competitors of the . . . seller, where the effect of such lease, sale, or contract for sale or such condition, agreement, or understanding may be to substantially lessen competition or tend to create a monopoly in any line of commerce."

Obviously the contracts here at issue would be proscribed if § 3 stopped short of the qualifying clause beginning, "where the effect of such lease, sale, or contract

---

[4] After the Clayton Bill, H. R. 15657, 63d Cong., 2d Sess., had passed the House, the Senate struck § 4, the section prohibiting tying clauses and requirements contracts, on the ground that such practices were subject to condemnation by the Federal Trade Commission under the then pending Trade Commission Bill. In support of a motion to reconsider this vote, Senator Reed of Missouri argued that the Trade Commission would be unlikely to outlaw agreements of a type held by this Court, in *Henry* v. *A. B. Dick Co.*, 224 U. S. 1, not to be in violation of the Sherman Act. See 51 Cong. Rec. 14088, 14090–92. The motion was agreed to. *Id.* at 14223.

for sale . . . ." If effect is to be given that clause, however, it is by no means obvious, in view of Standard's minority share of the "line of commerce" involved, of the fact that that share has not recently increased, and of the claims of these contracts to economic utility, that the effect of the contracts may be to lessen competition or tend to create a monopoly. It is the qualifying clause, therefore, which must be construed.

The District Court held that the requirement of showing an actual or potential lessening of competition or a tendency to establish monopoly was adequately met by proof that the contracts covered "a substantial number of outlets and a substantial amount of products, whether considered comparatively or not." 78 F. Supp. at 875. Given such quantitative substantiality, the substantial lessening of competition—so the court reasoned—is an automatic result, for the very existence of such contracts denies dealers opportunity to deal in the products of competing suppliers and excludes suppliers from access to the outlets controlled by those dealers. Having adopted this standard of proof, the court excluded as immaterial testimony bearing on "the economic merits or demerits of the present system as contrasted with a system which prevailed prior to its establishment and which would prevail if the court declared the present arrangement [invalid]." The court likewise deemed it unnecessary to make findings, on the basis of evidence that was admitted, whether the number of Standard's competitors had increased or decreased since the inauguration of the requirements-contract system, whether the number of their dealers had increased or decreased, and as to other matters which would have shed light on the comparative status of Standard and its competitors before and after the adoption of that system. The court concluded:

"Grant that, on a comparative basis, and in relation to the entire trade in these products in the area,

the restraint is not integral. Admit also that control of distribution results in lessening of costs and that its abandonment might increase costs. . . . Concede further, that the arrangement was entered into in good faith, with the honest belief that control of distribution and consequent concentration of representation were economically beneficial to the industry and to the public, that they have continued for over fifteen years openly, notoriously and unmolested by the Government, and have been practiced by other major oil companies competing with Standard, that the number of Standard outlets so controlled may have decreased, and the quantity of products supplied to them may have declined, on a comparative basis. Nevertheless, as I read the latest cases of the Supreme Court, I am compelled to find the practices here involved to be violative of both statutes. For they affect injuriously a sizeable part of interstate commerce, or, —to use the current phrase,—'an appreciable segment' of interstate commerce."

The issue before us, therefore, is whether the requirement of showing that the effect of the agreements "may be to substantially lessen competition" may be met simply by proof that a substantial portion of commerce is affected or whether it must also be demonstrated that competitive activity has actually diminished or probably will diminish.[5]

---

[5] It is clear, of course, that the "line of commerce" affected need not be nationwide, at least where the purchasers cannot, as a practical matter, turn to suppliers outside their own area. Although the effect on competition will be quantitatively the same if a given volume of the industry's business is assumed to be covered, whether or not the affected sources of supply are those of the industry as a whole or only those of a particular region, a purely quantitative measure of this effect is inadequate because the narrower the area of competition, the greater the comparative effect on the area's competitors. Since

Since the Clayton Act became effective, this Court has passed on the applicability of § 3 in eight cases, in five of which it upheld determinations that the challenged agreement was violative of that Section. Three of these—*United Shoe Machinery Corp.* v. *United States,* 258 U. S. 451; *International Business Machines Corp.* v. *United States,* 298 U. S. 131; *International Salt Co.* v. *United States,* 332 U. S. 392—involved contracts tying to the use of a patented article all purchases of an unpatented product used in connection with the patented article. The other two cases—*Standard Fashion Co.* v. *Magrane-Houston Co.,* 258 U. S. 346; *Fashion Originators' Guild* v. *Federal Trade Comm'n,* 312 U. S. 457—involved requirements contracts not unlike those here in issue.

The *Standard Fashion* case, the first of the five holding that the Act had been violated, settled one question of interpretation of § 3. The Court said:

> "Section 3 condemns sales or agreements where the effect of such sale or contract of sale 'may' be to substantially lessen competition or tend to create monopoly. . . . But we do not think that the purpose in using the word 'may' was to prohibit the mere possibility of the consequences described. It was intended to prevent such agreements as would under the circumstances disclosed probably lessen competition, or create an actual tendency to monopoly." 258 U. S. at 356–57. See also *Federal Trade Comm'n* v. *Morton Salt Co.,* 334 U. S. 37, 46, n. 14.

it is the preservation of competition which is at stake, the significant proportion of coverage is that within the area of effective competition. Cf. *Indiana Farmer's Guide Publishing Co.* v. *Prairie Farmer Publishing Co.,* 293 U. S. 268, 279; *United States* v. *Yellow Cab Co.,* 332 U. S. 218, 226. The criteria of substantiality deemed relevant in cases involving a nationwide market are thus also relevant in measuring the effect of Standard's requirements contracts in the seven-state Western area.

The Court went on to add that the fact that the Section "was not intended to reach every remote lessening of competition is shown in the requirement that such lessening must be substantial," but because it deemed the finding of two lower courts that the contracts in question did substantially lessen competition and tend to create monopoly amply supported by evidence that the defendant controlled two-fifths of the nation's pattern agencies, it did not pause to indicate where the line between a "remote" and a "substantial" lessening should be drawn.

All but one of the later cases also regarded domination of the market as sufficient in itself to support the inference that competition had been or probably would be lessened. In the *United Shoe Machinery* case, referring, *inter alia,* to the clause incorporated in all United's leases of patented machinery requiring the use by the lessee of materials supplied by United, the Court observed:

> "That such restrictive and tying agreements must necessarily lessen competition and tend to monopoly is, we believe, . . . apparent. When it is considered that the United Company occupies a dominating position in supplying shoe machinery of the classes involved, these covenants signed by the lessee and binding upon him effectually prevent him from acquiring the machinery of a competitor of the lessor except at the risk of forfeiting the right to use the machines furnished by the United Company which may be absolutely essential to the prosecution and success of his business." 258 U. S. at 457–58.

In the *International Business Machines* case, the defendants were the sole manufacturers of a patented tabulating machine requiring the use of unpatented cards. The lessees of the machines were bound by tying clauses to use in them only the cards supplied by the defendants,

who, between them, divided the whole of the $3,000,000 annual gross of this business also. The Court concluded:

> "These facts, and others, which we do not stop to enumerate, can leave no doubt that the effect of the condition in appellant's leases 'may be to substantially lessen competition,' and that it tends to create monopoly, and has in fact been an important and effective step in the creation of monopoly." 298 U. S. at 136.

The *Fashion Originators' Guild* case involved an association of dress manufacturers which sold more than 60% of all but the cheapest women's garments. In rejecting the relevance of evidence that the Guild's use of requirements contracts was a "reasonable and necessary" measure of protection against "the devastating evils growing from the pirating of original designs," the Court again emphasized the presence and the consequences of economic power:

> "The purpose and object of this combination, its potential power, its tendency to monopoly, the coercion it could and did practice upon a rival method of competition, all brought it within the policy of the prohibition declared by the Sherman and Clayton Acts." 312 U. S. at 467–68.

It is thus apparent that none of these cases controls the disposition of the present appeal, for Standard's share of the retail market for gasoline, even including sales through company-owned stations, is hardly large enough to conclude as a matter of law that it occupies a dominant position, nor did the trial court so find. The cases do indicate, however, that some sort of showing as to the actual or probable economic consequences of the agreements, if only the inferences to be drawn from the fact of dominant power, is important, and to that extent they tend to support appellant's position.

Two of the three cases decided by this Court which have held § 3 inapplicable also lend support to the view that such a showing is necessary. These are, *Federal Trade Comm'n* v. *Sinclair Co.*, 261 U. S. 463, and *Pick Mfg. Co.* v. *General Motors Corp.*, 299 U. S. 3. The third—*Federal Trade Comm'n* v. *Curtis Pub. Co.*, 260 U. S. 568— went off on the ground that the contract involved was one of agency and so is of no present relevance. The *Sinclair* case involved the lease of gasoline pumps and storage tanks on condition that the dealer would use them only for Sinclair's gasoline, but Sinclair did not own patents on the pumps or tanks and evidently did not otherwise control their supply. Although the Trade Commission had found that few dealers needed more than one pump, the Court concluded that "the record does not show that the probable effect of the practice will be unduly to lessen competition." 261 U. S. at 475. The basis of this conclusion was thus summarized:

> "Many competitors seek to sell excellent brands of gasoline and no one of them is essential to the retail business. The lessee is free to buy wherever he chooses; he may freely accept and use as many pumps as he wishes and may discontinue any or all of them. He may carry on business as his judgment dictates and his means permit, save only that he cannot use the lessor's equipment for dispensing another's brand. By investing a comparatively small sum, he can buy an outfit and use it without hindrance. He can have respondent's gasoline, with the pump or without the pump, and many competitors seek to supply his needs." *Id.* at 474.

The present case differs of course in the fact that a dealer who has entered into a requirements contract with Standard cannot consistently with that contract sell the petroleum products of a competitor of Standard's no

matter how many pumps he has,[6] but the case is significant for the importance it attaches, in the absence of a showing that the supplier dominated the market, to the practical effect of the contracts. The same is true of the *Pick* case, in which this Court affirmed in a brief *per curiam* opinion the finding of the District Court, concurred in by the Court of Appeals, that the effect of contracts by which dealers agreed not to sell other automobile parts than those manufactured by General Motors "had not been in any way substantially to lessen competition or to create a monopoly in any line of commerce." 299 U. S. at 4.

But then came *International Salt Co. v. United States,* 332 U. S. 392. That decision, at least as to contracts tying the sale of a nonpatented to a patented product, rejected the necessity of demonstrating economic consequences once it has been established that "the volume of business affected" is not "insignificant or insubstantial" and that the effect of the contracts is to "foreclose competitors from [a] substantial market." *Id.* at 396. Upon that basis we affirmed a summary judgment granting an injunction against the leasing of machines for the utilization of salt products on the condition that the lessee use in

---

[6] Standard urges that the effect of its contracts is similarly confined in view of the fact that they apply not to all sales by a dealer but only to those made through a designated service station. Putting aside the fact that it does not appear that dealers commonly own more than one service station, there is marked difference between a contract which confines an entire retail outlet to the sale of a single brand and a contract which merely confines the use of a dispensing mechanism to a single brand: service-station sites, and therefore retail outlets, are limited in number; the number of pumps which a dealer may choose to set up is not, or so, at least, the Court assumed in the *Sinclair* case. It is reasonable to assume, therefore, that competition between suppliers is directed rather toward exclusive contracts with the maximum number of strategically located outlets than toward exclusive arrangements with dealers as such.

them only salt supplied by defendant. It was established by pleadings or admissions that defendant was the country's largest producer of salt for industrial purposes, that it owned patents on the leased machines, that about 900 leases were outstanding, and that in 1944 defendant sold about $500,000 worth of salt for use in these machines. It was not established that equivalent machines were unobtainable, it was not indicated what proportion of the business of supplying such machines was controlled by defendant, and it was deemed irrelevant that there was no evidence as to the actual effect of the tying clauses upon competition.[7] It is clear, therefore, that unless a distinction is to be drawn for purposes of the applicability of § 3 between requirements contracts and contracts tying the sale of a nonpatented to a patented product, the showing that Standard's requirements contracts affected a gross business of $58,000,000 comprising 6.7% of the total in the area goes far toward supporting the inference that competition has been or probably will be substantially lessened.[8]

In favor of confining the standard laid down by the *International Salt* case to tying agreements, important economic differences may be noted. Tying agreements serve hardly any purpose beyond the suppression of com-

---

[7] The Court considered and found inadequate defendant's attempt to establish that the successful use of the machines depended upon a quality of salt which only it could supply, but the Court's willingness to consider such evidence does not weaken the holding that coverage of a more than insignificant volume of business by such tying clauses is an adequate basis for finding a lessening of competition or a tendency to monopoly.

[8] It may be noted in passing that the exclusive supply provisions for tires, tubes, batteries, and other accessories which are a part of some of Standard's contracts with dealers who have also agreed to purchase their requirements of petroleum products should perhaps be considered, as a matter of classification, tying rather than requirements agreements.

petition. The justification most often advanced in their defense—the protection of the good will of the manufacturer of the tying device—fails in the usual situation because specification of the type and quality of the product to be used in connection with the tying device is protection enough. If the manufacturer's brand of the tied product is in fact superior to that of competitors, the buyer will presumably choose it anyway. The only situation, indeed, in which the protection of good will may necessitate the use of tying clauses is where specifications for a substitute would be so detailed that they could not practicably be supplied. In the usual case only the prospect of reducing competition would persuade a seller to adopt such a contract and only his control of the supply of the tying device, whether conferred by patent monopoly or otherwise obtained, could induce a buyer to enter one. See Miller, Unfair Competition 199 *et seq.* (1941); Note, 49 Col. L. Rev. 241, 246 (1949). The existence of market control of the tying device, therefore, affords a strong foundation for the presumption that it has been or probably will be used to limit competition in the tied product also.

_ Requirements contracts, on the other hand, may well be of economic advantage to buyers as well as to sellers, and thus indirectly of advantage to the consuming public. In the case of the buyer, they may assure supply, afford protection against rises in price, enable long-term planning on the basis of known costs,[9] and obviate the expense and risk of storage in the quantity necessary for a commodity having a fluctuating demand. From the seller's point of view, requirements contracts may make possible the substantial reduction of selling expenses, give pro-

---

[9] This advantage is not conferred by Standard's contracts, each of which provides that the price to be paid by the dealer is to be the "Company's posted price to its dealers generally at time and place of delivery."

tection against price fluctuations, and—of particular advantage to a newcomer to the field to whom it is important to know what capital expenditures are justified—offer the possibility of a predictable market. See Stockhausen, *The Commercial and Anti-Trust Aspects of Term Requirements Contracts*, 23 N. Y. U. L. Q. Rev. 412, 413–14 (1948). They may be useful, moreover, to a seller trying to establish a foothold against the counterattacks of entrenched competitors. See *id.* at 424 *et seq.; Excelsior Motor Mfg. & Supply Co. v. Sound Equipment, Inc.*, 73 F. 2d 725, 728 (C. A. 7th Cir.); *General Talking Pictures Corp. v. American Tel. & Tel. Co.*, 18 F. Supp. 650, 666 (D. Del.).[10]  Since these advantages of requirements contracts may often be sufficient to account for their use, the coverage by such contracts of a substantial amount of business affords a weaker basis for the inference that competition may be lessened than would similar coverage by tying clauses, especially where use of the latter is combined with market control of the tying device. A patent, moreover, although in fact there may be many competing substitutes for the patented article, is at least *prima facie* evidence of such control.  And so we could not dispose of this case merely by citing *International Salt Co. v. United States,* 332 U. S. 392.

Thus, even though the qualifying clause of § 3 is appended without distinction of terms equally to the prohibition of tying clauses and of requirements contracts, pertinent considerations support, certainly as a matter of economic reasoning, varying standards as to each for the

---

[10] Some members of the House opposed § 4 of H. R. 15657, 63d Cong., 2d Sess. (the equivalent of what is now § 3) as denying this benefit to the newcomer, see 51 Cong. Rec. 9267, and Representative McCoy of New Jersey offered an amendment, *id.* at 9398, to make the agreements in question illegal only when entered "with the intent of obtaining or establishing a monopoly or of destroying the business of a competitor," which he and others supported on this ground. See *id.* at 9400–02, 9409.  The amendment was rejected. *Id.* at 9410.

proof necessary to fulfill the conditions of that clause. If this distinction were accepted, various tests of the economic usefulness or restrictive effect of requirements contracts would become relevant. Among them would be evidence that competition has flourished despite use of the contracts, and under this test much of the evidence tendered by appellant in this case would be important. See, as examples of the consideration of such evidence, *B. S. Pearsall Butter Co.* v. *Federal Trade Comm'n,* 292 Fed. 720 (C. A. 7th Cir.); *Pick Mfg. Co.* v. *General Motors Corp.,* 80 F. 2d 641, 644 (C. A. 7th Cir.), aff'd, 299 U. S. 3. Likewise bearing on whether or not the contracts were being used to suppress competition, would be the conformity of the length of their term to the reasonable requirements of the field of commerce in which they were used. See *Corn Products Refining Co.* v. *Federal Trade Comm'n,* 144 F. 2d 211, 220 (C. A. 7th Cir.), aff'd, 324 U. S. 726; *United States* v. *Pullman Co.,* 50 F. Supp. 123, 127–29 (E. D. Pa.). Still another test would be the status of the defendant as a struggling newcomer or an established competitor. Perhaps most important, however, would be the defendant's degree of market control, for the greater the dominance of his position, the stronger the inference that an important factor in attaining and maintaining that position has been the use of requirements contracts to stifle competition rather than to serve legitimate economic needs. See *Standard Fashion Co.* v. *Magrane-Houston Co., supra,* 258 U. S. 346; *Fashion Originators' Guild* v. *Federal Trade Comm'n, supra,* 312 U. S. 457.[11]

Yet serious difficulties would attend the attempt to apply these tests. We may assume, as did the court below, that no improvement of Standard's competitive

---

[11] For an exposition of the considerations here summarized, see Stockhausen, *The Commercial and Anti-Trust Aspects of Term and Requirements Contracts,* 23 N. Y. U. L. Q. Rev. 412, 417–31 (1948).

position has coincided with the period during which the requirements-contract system of distribution has been in effect. We may assume further that the duration of the contracts is not excessive and that Standard does not by itself dominate the market. But Standard was a major competitor when the present system was adopted, and it is possible that its position would have deteriorated but for the adoption of that system. When it is remembered that all the other major suppliers have also been using requirements contracts, and when it is noted that the relative share of the business which fell to each has remained about the same during the period of their use,[12] it would not be farfetched to infer that their effect has been to enable the established suppliers individually to maintain their own standing and at the same time collectively, even though not collusively, to prevent a late arrival from wresting away more than an insignificant portion of the market. If, indeed, this were a result of the system, it would seem unimportant that a short-run by-product of stability may have been greater efficiency and lower costs, for it is the theory of the antitrust laws that the long-run advantage of the community depends upon the removal of restraints upon competition. See *Fashion Originators' Guild* v. *Federal Trade Comm'n*, 312 U. S. 457, 467–68; *United States* v. *Aluminum Co. of America*, 148 F. 2d 416, 427–29 (C. A. 2d Cir.).

Moreover, to demand that bare inference be supported by evidence as to what would have happened but for

---

[12] Upon the request of Standard, its six largest competitors filled out questionnaires showing the number of retail dealers who distributed their products during the years 1937 through 1946. Though their position relative to each other has fluctuated, the figures show that as a group they have maintained or improved their control of the market. Together with Standard, these six companies distributed, as of 1946, through 26,439 of approximately 35,000 independent service stations in the Western area.

the adoption of the practice that was in fact adopted or to require firm prediction of an increase of competition as a probable result of ordering the abandonment of the practice, would be a standard of proof, if not virtually impossible to meet, at least most ill-suited for ascertainment by courts.[13]   Before the system of requirements contracts was instituted, Standard sold gasoline through independent service-station operators as its agents, and it might revert to this system if the judgment below were sustained.   Or it might, as opportunity presented itself, add service stations now operated independently to the number managed by its subsidiary, Standard Stations, Inc.   From the point of view of maintaining or extending competitive advantage, either of these alternatives would be just as effective as the use of requirements contracts, although of course insofar as they resulted in a tendency to monopoly they might encounter the anti-monopoly provisions of the Sherman Act.   See *United States* v. *Aluminum Co. of America,* 148 F. 2d 416 (C. A. 2d Cir.).   As appellant points out, dealers might order petroleum products in quantities sufficient to meet their estimated needs for the period during which requirements contracts are now effective, and even that would foreclose competition to some degree.   So long as these diverse ways of restricting competition remain open, therefore, there can be no conclusive proof that the use of requirements contracts has actually re-

---

[13] The dual system of enforcement provided for by the Clayton Act must have contemplated standards of proof capable of administration by the courts as well as by the Federal Trade Commission and other designated agencies.   See 38 Stat. 734, 736, as amended, 15. U. S. C. §§ 21, 25.   Our interpretation of the Act, therefore, should recognize that an appraisal of economic data which might be practicable if only the latter were faced with the task may be quite otherwise for judges unequipped for it either by experience or by the availability of skilled assistance.

duced competition below the level which it would otherwise have reached or maintained.

We are dealing here with a particular form of agreement specified by § 3 and not with different arrangements, by way of integration or otherwise, that may tend to lessen competition. To interpret that section as requiring proof that competition has actually diminished would make its very explicitness a means of conferring immunity upon the practices which it singles out. Congress has authoritatively determined that those practices are detrimental where their effect may be to lessen competition. It has not left at large for determination in each case the ultimate demands of the "public interest," as the English lawmakers, considering and finding inapplicable to their own situation our experience with the specific prohibition of trade practices legislatively determined to be undesirable, have recently chosen to do.[14] Though it may be that such an alternative to the present system as buying out independent dealers and making

---

[14] The Monopolies and Restrictive Practices (Inquiry and Control) Act, 1948, adopted July 30, 1948, provides, as one mode of procedure, for reference of restrictive trade practices by the Board of Trade to a permanent Commission for investigation in order to determine "whether any such things as are specified in the reference . . . operate or may be expected to operate against the public interest." 11 & 12 Geo. VI, c. 66, § 6 (2). The Act does not define what is meant by "the public interest," although in § 14 it sets up broad criteria to be taken into account. It is noteworthy, however, that, having established so broad a basis for investigation, the Act entrusts the task to an expert body without provision for judicial review. This approach was repeatedly contrasted in debate with that of the United States. See 449 H. C. Deb. 2046–47, 2058, 2063 (5th ser. 1948); 157 H. L. Deb. 350 (5th ser. 1948). Compare § 5 (2) of the Interstate Commerce Act, as amended, 41 Stat. 480, 49 U. S. C. § 5 (2), referring to the Interstate Commerce Commission determination of the more defined issues of "public interest" under review in *New York Central Securities Corp.* v. *United States,* 287 U. S. 12, 24; *United States* v. *Lowden,* 308 U. S. 225.

them dependent employees of Standard Stations, Inc., would be a greater detriment to the public interest than perpetuation of the system, this is an issue, like the choice between greater efficiency and freer competition, that has not been submitted to our decision. We are faced, not with a broadly phrased expression of general policy, but merely a broadly phrased qualification of an otherwise narrowly directed statutory provision.

In this connection it is significant that the qualifying language was not added until after the House and Senate bills reached Conference. The conferees responsible for adding that language were at pains, in answering protestations that the qualifying clause seriously weakened the section, to disclaim any intention seriously to augment the burden of proof to be sustained in establishing violation of it.[15] It seems hardly likely that, having with one hand set up an express prohibition against a practice thought to be beyond the reach of the Sherman Act, Congress meant, with the other hand, to reestablish the necessity of meeting the same tests of detriment to the public interest as that Act had been interpreted as re-

---

[15] Representative Floyd of Arkansas, one of the managers on the part of the House, explained the use of the word "substantially" as deriving from the opinion of this Court in *Addyston Pipe & Steel Co.* v. *United States,* 175 U. S. 211, and quoted the passage from *id.* at 229 in which it is said that "the power of Congress to regulate interstate commerce comprises the right to enact a law prohibiting the citizen from entering into those private contracts which directly and substantially, and not merely indirectly, remotely, incidentally and collaterally, regulate to a greater or less degree commerce among the States." 51 Cong. Rec. 16317–18. Senator Chilton, one of the managers on the part of the Senate, denying that the clause weakened the bill, stated that the words "where the effect may be" mean "where it is possible for the effect to be." *Id.* at 16002. Senator Overman, also a Senate conferee, argued that even the elimination of competition in a single town would substantially lessen competition. *Id.* at 15935.

quiring.[16] Yet the economic investigation which appellant would have us require is of the same broad scope as was adumbrated with reference to unreasonable restraints of trade in *Chicago Board of Trade* v. *United States,* 246 U. S. 231.[17] To insist upon such an investigation would be to stultify the force of Congress' declaration that requirements contracts are to be prohibited wherever their effect "may be" to substantially lessen competition. If in fact it is economically desirable for service stations to confine themselves to the sale of the petroleum products of a single supplier, they will continue

[16] See *United States* v. *American Tobacco Co.,* 221 U. S. 106, 179: "Applying the rule of reason to the construction of the statute, it was held in the *Standard Oil Case* that as the words 'restraint of trade' at common law and in the law of this country at the time of the adoption of the Anti-trust Act only embraced acts or contracts or agreements or combinations which operated to the prejudice of the public interests by unduly restricting competition or unduly obstructing the due course of trade or which, either because of their inherent nature or effect or because of the evident purpose of the acts, etc., injuriously restrained trade, that the words as used in the statute were designed to have and did have but a like significance." See also Handler, *A Study of the Construction and Enforcement of the Federal Antitrust Laws* 3–9 (T. N. E. C. Monograph No. 38, 1941). Compare § 4 of the Australian Industries Preservation Act, 1906, which forbids combinations entered into "with intent to restrain trade or commerce to the detriment of the public," construed in *Attorney General* v. *Adelaide S. S. Co.,* [1913] A. C. 781, as requiring proof of actual economic detriment.

[17] "The true test of legality is whether the restraint imposed is such as merely regulates and perhaps thereby promotes competition or whether it is such as may suppress or even destroy competition. To determine that question the court must ordinarily consider the facts peculiar to the business to which the restraint is applied; its condition before and after the restraint was imposed; the nature of the restraint and its effect, actual or probable. The history of the restraint, the evil believed to exist, the reason for adopting the particular remedy, the purpose or end sought to be attained, are all relevant facts." 246 U. S. at 238.

to do so though not bound by contract, and if in fact it is important to retail dealers to assure the supply of their requirements by obtaining the commitment of a single supplier to fulfill them, competition for their patronage should enable them to insist upon such an arrangement without binding them to refrain from looking elsewhere.

We conclude, therefore, that the qualifying clause of § 3 is satisfied by proof that competition has been foreclosed in a substantial share of the line of commerce affected. It cannot be gainsaid that observance by a dealer of his requirements contract with Standard does effectively foreclose whatever opportunity there might be for competing suppliers to attract his patronage, and it is clear that the affected proportion of retail sales of petroleum products is substantial. In view of the widespread adoption of such contracts by Standard's competitors and the availability of alternative ways of obtaining an assured market, evidence that competitive activity has not actually declined is inconclusive. Standard's use of the contracts creates just such a potential clog on competition as it was the purpose of § 3 to remove wherever, were it to become actual, it would impede a substantial amount of competitive activity.

Since the decree below is sustained by our interpretation of § 3 of the Clayton Act, we need not go on to consider whether it might also be sustained by § 1 of the Sherman Act.

One last point remains to be disposed of. Appellant contends that its requirements contracts with California dealers, because nearly all the products sold to them are produced in California, do not substantially affect interstate commerce and therefore should have been exempted from the decree. It finds support for this contention in *Addyston Pipe & Steel Co.* v. *United States,* 175 U. S. 211, 247. But the effect of appellant's requirements contracts with California retail dealers is to prevent them

from dealing with suppliers from outside the State as well, as within the State and is thus to lessen competition in both interstate and intrastate commerce. Appellant has not suggested that if these dealers were not bound by their contracts with it that they would continue to purchase only products originating within the State. The *Addyston* case, on the other hand, dealt not with the diminution of competition between suppliers brought about by the action of one at the expense of the rest, whether within or without the State, but a combination among them to restrain competition. Modification of the decree was required only to make clear that it did not reach a combination among the defendants doing business in a single State which was confined to transactions taking place within that same State.

The judgment below is

*Affirmed.*

MR. JUSTICE DOUGLAS.

The economic theories which the Court has read into the Anti-Trust Laws have favored rather than discouraged monopoly. As a result of the big business philosophy underlying *United States* v. *United Shoe Machinery Co.,* 247 U. S. 32; *United States* v. *United States Steel Corp.,* 251 U. S. 417; *United States* v. *International Harvester Co.,* 274 U. S. 693, big business has become bigger and bigger. Monopoly has flourished. Cartels have increased their hold on the nation. The trusts wax strong.[1] There is less and less place for the independent.

---

[1] See Final Report and Recommendations of the Temporary National Economic Committee, S. Doc. No. 35, 77th Cong., 1st Sess. (1941). For more detailed analyses, see Competition and Monopoly in American Industry (TNEC Monograph 21, 1940) pp. 299 *et seq.;* The Structure of Industry (TNEC Monograph 27, 1941) pp. 231 *et seq.;* The Distribution of Ownership in the 200 Largest Non-financial Corporations (TNEC Monograph 29, 1940); Relative

The full force of the Anti-Trust Laws has not been felt on our economy.   It has been deflected.   Niggardly in-terpretations have robbed those laws of much of their efficacy.   There are exceptions.   Price fixing is illegal *per*

---

Efficiency of Large, Medium-Sized, and Small Business (TNEC Monograph 13, 1941).

The merger and acquisition movement, which has been evident since the turn of the century and which contributed to the spiraling concentration of corporate wealth into the hands of the few, has not ended. We are presently in the midst of a similar movement. See the Federal Trade Commission report, The Present Trend of Corporate Mergers and Acquisitions, Sen. Doc. No. 17, 80th Cong., 1st Sess. (1947), p. 6, where it is shown that "the increase in the merger movement following VJ-day parallels very closely the sharp upward movement which took place at the end of World War I." The causes which have recently contributed to the growing bigness of big corporations are varied. See Lynch, The Concentration of Economic Power (1946), pp. 3–4 where it is said:

"Even before the entrance of the United States into the war the placing of defense contracts served to augment the growth of bigness in industry and to intensify the struggle for survival by small concerns. By 1941 the pattern of defense contracts which, with modifications, was to remain for the duration of the war had been established. It is reported that in that year fifty-six firms, less than one-half of 1 percent of the manufacturing establishments of the country, were awarded 75 percent of all the contracts. Concentration was even more marked within this group, however, inasmuch as six corporations held 31 percent of the total. Between June, 1940, and March, 1943, more than 100 million dollars worth of prime war-supply contracts were awarded. Seventy percent of these were held by the leading 100 corporations; 10 corporations held 32 percent, and the leading 50 held 60 percent.

"Studies by the United States Department of Commerce during 1943–1944 throw additional light on this trend toward industrial concentration. After Pearl Harbor the total number of firms in business declined precipitously. Despite the wartime industrial boom, the number of firms which discontinued operations was greater than that replaced by new entries; it is estimated that the number in business in 1943 was nearly 17 percent less than in 1941. There

*se.*[2] The use of patents to obtain monopolies on unpatented articles is condemned.[3] Monopoly that has been built as a result of unlawful tactics, *e. g.,* through practices that are restraints of trade, is broken up.[4] But when it comes to monopolies built in gentlemanly ways— by mergers, purchases of assets or control and the like— the teeth have largely been drawn from the Act.

are numerous indications that the relative importance of small business has declined during the war period and that the dominance of big business has become more marked. Between 1938 and 1942 it appears that the total number of workers employed by 95 percent of the nation's corporations (the smallest) declined 23 percent, whereas those employed by 5 percent of the corporations (the largest) increased 22 percent. A related study indicates that between January 1, 1941, and January 1, 1943, business firms employing fewer than 125 workers each experienced an increase in employment of 1 percent and an increase in the value of their product (attributable principally to price increases) of 16 percent; during the same period, however, the increase in employment by the large establishments employing more than 125 workers was 62 percent and the increase in the value of the product, 96 percent."

[2] See for example *United States* v. *Socony-Vacuum Oil Co.,* 310 U. S. 150.

[3] See for example *Mercoid Corp.* v. *Mid-Continent Co.,* 320 U. S. 661.

[4] See *United States* v. *Griffith,* 334 U. S. 100; *Schine Theatres* v. *United States,* 334 U. S. 110; *United States* v. *Paramount Pictures,* 334 U. S. 131, 172.

Those cases have largely expended the force of *Hartford-Empire Co.* v. *United States,* 323 U. S. 386—an indefensible decision whereby the Court allowed those who had built one of the tightest monopolies in American history largely to retain their ill-gotten gains and continue their hold on the economy. The philosophy of that decision can be summed up in the words Brandeis used to describe the decree effecting a so-called dissolution of the American Tobacco Co. He said that its defenders "appear to have discovered in the Constitution a new implied prohibition: *'What man has illegally joined together, let no court put asunder.'*" The Curse of Bigness (1935), p. 103.

We announced that the existence of monopoly power, coupled with the purpose or intent to monopolize, was unlawful.[5] But to date that principle has not shown bright promise in application.[6] Under the guise of increased efficiency big business has received approval for easy growth. *United States* v. *Columbia Steel Co.,* 334 U. S. 495, represents the current attitude of the Court on this problem. In that case United States Steel—the giant of the industry—was allowed to fasten its tentacles tighter on the economy by acquiring the assets of a steel company in the Far West where competition was beginning to develop.

The increased concentration of industrial power in the hands of a few has changed habits of thought. A new age has been introduced. It is more and more an age of "monopoly competition." Monopoly competition is a regime of friendly alliances, of quick and easy accommodation of prices even without the benefit of trade associations, of what Brandeis said was euphemistically called "cooperation."[7] While this is not true in all fields, it has become alarmingly apparent in many.

The lessons Brandeis taught on the curse of bigness have largely been forgotten in high places. Size is allowed to become a menace to existing and putative competitors. Price control is allowed to escape the influences of the competitive market and to gravitate into the hands of the few. But beyond all that there is the effect on the community when independents are swallowed up by the trusts and entrepreneurs become employees of absentee

---

[5] See *Schine Theatres* v. *United States, supra,* pp. 129–130.

[6] It should be noted in this connection that a majority of the Court could not be obtained for holding illegal *per se* the vertical integration in the motion picture industry. See *United States* v. *Paramount Pictures, supra,* pp. 173–174.

[7] Other People's Money (1933), p. 110.

owners. Then there is a serious loss in citizenship. Local leadership is diluted. He who was a leader in the village becomes dependent on outsiders for his action and policy. Clerks responsible to a superior in a distant place take the place of resident proprietors beholden to no one. These are the prices which the nation pays for the almost ceaseless growth in bigness on the part of industry.

These problems may not appear on the surface to have relationship to the case before us. But they go to the very heart of the problem.

It is common knowledge that a host of filling stations in the country are locally owned and operated. Others are owned and operated by the big oil companies. This case involves directly only the former. It pertains to requirements contracts that the oil companies make with these independents. It is plain that a filling-station owner who is tied to an oil company for his supply of products is not an available customer for the products of other suppliers. The same is true of a filling-station owner who purchases his inventory a year in advance. His demand is withdrawn from the market for the duration of the contract in the one case and for a year in the other. The result in each case is to lessen competition if the standard is day-to-day purchases. Whether it is a substantial lessening of competition within the meaning of the Anti-Trust Laws is a question of degree and may vary from industry to industry.

The Court answers the question for the oil industry by a formula which under our decisions promises to wipe out large segments of independent filling-station operators. The method of doing business under requirements contracts at least keeps the independents alive. They survive as small business units. The situation is not ideal

from either their point of view[8] or that of the nation. But the alternative which the Court offers is far worse from the point of view of both.

The elimination of these requirements contracts sets the stage for Standard and the other oil companies to build service-station empires of their own. The opinion of the Court does more than set the stage for that development. It is an advisory opinion as well, stating to the oil companies how they can with impunity build their empires. The formula suggested by the Court is either the use of the "agency" device, which in practical effect means control of filling stations by the oil companies (cf. *Federal Trade Commission* v. *Curtis Co.*, 260 U. S. 568), or the outright acquisition of them by subsidiary corporations or otherwise. See *United States* v. *Columbia Steel Co.*, *supra*. Under the approved judicial doctrine either of those devices means increasing the monopoly of the oil companies over the retail field.

When the choice is thus given, I dissent from the outlawry of the requirements contract on the present facts. The effect which it has on competition in this field is minor as compared to the damage which will flow from the judicially approved formula for the growth of bigness tendered by the Court as an alternative. Our choice must be made on the basis not of abstractions but of the realities of modern industrial life.

Today there is vigorous competition between the oil companies for the market. That competition has left some room for the survival of the independents. But when this inducement for their survival is taken away, we

---

[8] For the plight of the independent service-station operator see Control of the Petroleum Industry by Major Oil Companies (TNEC Monograph No. 39, 1941) pp. 46, 47, 52. See also Review and Criticism on Behalf of Standard Oil Co. (New Jersey) and Sun Oil Co. of Monograph No. 39 with Rejoinder by Monograph Author (TNEC Monograph 39–A, 1941).

can expect that the oil companies will move in to supplant them with their own stations. There will still be competition between the oil companies. But there will be a tragic loss to the nation. The small, independent business man will be supplanted by clerks. Competition between suppliers of accessories (which is involved in this case) will diminish or cease altogether. The oil companies will command an increasingly larger share of both the wholesale and the retail markets.

That is the likely result of today's decision. The requirements contract which is displaced is relatively innocuous as compared with the virulent growth of monopoly power which the Court encourages. The Court does not act unwittingly. It consciously pushes the oil industry in that direction. The Court approves what the Anti-Trust Laws were designed to prevent. It helps remake America in the image of the cartels.

MR. JUSTICE JACKSON, with whom THE CHIEF JUSTICE and MR. JUSTICE BURTON join, dissenting.

I am unable to join the judgment or opinion of the Court for reasons I will state, but shortly.

Section 3 of the Clayton Act does not make any lease, sale, or contract unlawful unless "the effect of such lease, sale, or contract for sale or such condition, agreement or understanding may be to substantially lessen competition or tend to create a monopoly in any line of commerce." 38 Stat. 730, 731, 15 U. S. C. § 14. It is indispensable to the Government's case to establish that either the actual or the probable effect of the accused arrangement is to substantially lessen competition or tend to create a monopoly.

I am unable to agree that this requirement was met. To be sure, the contracts cover "a substantial number of outlets and a substantial amount of products, whether considered comparatively or not." 78 F. Supp. 850, 875.

But that fact does not automatically bring the accused arrangement within the prohibitions of the statute. The number of dealers and the volume of sales covered by the arrangement of course was sufficient to be substantial. That is to say, this arrangement operated on enough commerce to violate the Act, provided its effects were substantially to lessen competition or tend to create a monopoly. But proof of their quantity does not prove that they had this forbidden quality; and the assumption that they did, without proof, seems to me unwarranted.

Moreover, the trial court not only made the assumption but he did not allow the defendant affirmatively to show that such effects do not flow from this arrangement. Such evidence on the subject as was admitted was not considered in reaching the decision that these contracts are illegal.

I regard it as unfortunate that the Clayton Act submits such economic issues to judicial determination. It not only leaves the law vague as a warning or guide, and determined only after the event, but the judicial process is not well adapted to exploration of such industry-wide, and even nation-wide, questions.

But if they must decide, the only possible way for the courts to arrive at a fair determination is to hear all relevant evidence from both parties and weigh not only its inherent probabilities of verity but also compare the experience, disinterestedness and credibility of opposing witnesses. This is a tedious process and not too enlightening, but without it a judicial decree is but a guess in the dark. That is all we have here and I do not think it is an adequate basis on which to upset long-standing and widely practiced business arrangements.

I should therefore vacate this decree and direct the court below to complete the case by hearing and weighing the Government's evidence and that of defendant as to the effects of this device.

However, if the Court refuses to do that, I cannot agree that the requirements contract is *per se* an illegal one under the antitrust law, and that is the substance of what the Court seems to hold. I am not convinced that the requirements contract as here used is a device for suppressing competition instead of a device for waging competition. If we look only at its effect in relation to particular retailers who become parties to it, it does restrain their freedom to purchase their requirements elsewhere and prevents other companies from selling to them. Many contracts have the effect of taking a purchaser out of the market for goods he already has bought or contracted to take. But the retailer in this industry is only a conduit from the oil fields to the driver's tank, a means by which the oil companies compete to get the business of the ultimate consumer—the man in whose automobile the gas is used. It means to me, if I must decide without evidence, that these contracts are an almost necessary means to maintain this all-important competition for consumer business, in which it is admitted competition is keen. The retail stations, whether independent or company-owned, are the instrumentalities through which competition for this ultimate market is waged.

It does not seem to me inherently to lessen this real competition when an oil company tries to establish superior service by providing the consumer with a responsible dealer from which the public can purchase adequate and timely supplies of oil, gasoline and car accessories of some known and reliable standard of quality. No retailer, whether agent or independent, can long remain in business if he does not always, and not just intermittently, have gas to sell. Retailers' storage capacity usually is limited and they are in no position to accumulate large stocks. They can take gas only when and as they can sell it. The Government can hardly force someone to contract to stand by, ever ready to fill

fluctuating demands of dealers who will not in turn undertake to buy from that supplier all their requirements. And it is important to the driving public to be able to rely on retailers to have gas to retail. It is equally important that the wholesaler have some incentive to carry the stocks and have the transport facilities to make the irregular deliveries caused by varied consumer demands.

It may be that the Government, if required to do so, could prove that this is a bad system and an illegal one. It may be that the defendant, if permitted to do so, can prove that it is, in its overall aspects, a good system and within the law. But on the present record the Government has not made a case.[1]

If the courts are to apply the lash of the antitrust laws to the backs of businessmen to make them compete, we cannot in fairness also apply the lash whenever they hit upon a successful method of competing. That, insofar as I am permitted by the record to learn the facts, appears to be the case before us. I would reverse.

---

[1] The Government can derive no comfort for this sort of thing from *International Salt Co.* v. *United States,* 332 U. S. 392. There the defendant started with a patent monopoly of the machine for utilization of its product. The customers, canners, were in effect the ultimate consumers of salt as such. But they could get the advantages of the invention only if they tied themselves to use no other salt therein.